### IN THE UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-2044

MORTAL VENTURES, LLC DBA MORTAL
KOMBUCHA;
MJM SALES MANAGEMENT LLC, AKA MJM MANAGEMENT LLC;
  Plaintiffs,

v.

HIGH COUNTRY KOMBUCHA, INC DBA ROCKY MOUNTAIN
CULTURES, a Colorado corporation;
HTL INVESTMENTS, LLC, a Wisconsin limited liability company;
IC BEV GROUP, LLC DBA ISLAND CITY KOMBUCHA, a
Wisconsin limited liability company;
BETTER BEVERAGES LLC [sic] aka BETTER BEVERAGE
GROUP, a Colorado unregistered partnership;
DAVID S. HAERTLE, individually, and in his official capacity as
owner and director of all Defendant entities;
JOSEPH C. HAERTLE individually, and in his official capacity as
manager of all Defendant entities;
SAMANTHA HAERTLE individually, and in her official capacity
as manager of all Defendant entities;
JAIME HAERTLE, individually, and in her official capacity as
manager of all Defendant entities;
SHANE DICKMAN, individually, and in his official capacity as
manager of High Country Kombucha inc. and Better Beverages;
and
MARCUS GORDON individually, and in his official capacity as
manager of High Country Kombucha inc. and Better Beverages.
  Defendants.

---

## COMPLAINT

---

    1.    Plaintiffs Mortal Ventures, LLC and MJM Sales Management, LLC, (each,

a "Plaintiff", and collectively, "Plaintiffs") by and through the under signed counsel J.A.

LLC allege as set forth below.

1

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 3

PARTIES ................................................................................................................... 5

JURISDICTION AND VENUE .................................................................................... 7

FACTUAL BACKGROUND ........................................................................................ 8

WISCONSIN DEFENDANTS' TIES TO COLORADO ............................................... 16

MV AGREES TO LICENSE MORTAL KOMBUCHA TO DEFENDANT HCK ................. 19

WISCONSIN DEFENDANTS' INVOLVEMENT IN DEFENDANT HCK ........................... 28

WISCONSIN DEFENDANTS ACQUIRE DEFENDANT HCK ......................................... 33

DEFENDANT BETTER BEVERAGES INFRINGES MV'S COPYRIGHTS AND
TRADEMARKS........................................................................................................... 39

DEFENDANTS REFUSED TO RETURN MV'S CAPPER AND HAVE
MISAPPROPRIATED MV'S INTELLECTUAL PROPERTY ............................................. 42

COUNT I - Violations of the Racketeer Influenced and Corrupt Organizations Act
Against Defendants HTL, HCK, ICK, David Haertle, Samantha Haertle, Joseph Haertle,
Shane Dickman, and Marcus Gordon.......................................................................... 43

COUNT II – Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations
Act Against All Defendants ........................................................................................ 48

COUNT III - Violation of COCCA Against Defendants HTL, HCK, ICK, David Haertle,
Samantha Haertle, Joseph Haertle, Shane Dickman, and Marcus Gordon .................... 49

COUNT IV - Conspiracy to Violate COCCA Against all Defendants ................................ 54

COUNT V - Trade Secret Misappropriation Pursuant to the Colorado Uniform Trade
Secrets Act Against All Defendants ............................................................................. 55

COUNT VI – Breach of Contract Against Defendant HCK .............................................. 56

COUNT VII – Breach of Contract Against Defendant HTL.............................................. 58

COUNT VIII – Conversion Against All Defendants......................................................... 58

COUNT IX – Replevin Against All Defendants.............................................................. 59

COUNT X –Civil Theft Against all Defendants ............................................................. 60

COUNT XII –Breach of Contract Against Defendant HCK and Defendant Better
Beverages ................................................................................................................ 61

COUNT XIII –Breach of the Duty of Good Faith and Fair Dealing Against Defendants
HCK, Shane Dickman, Marcus Gordon, and David Haertle............................................ 62

COUNT XIV – Violations of Lanham Act Against All Defendants .................................... 63

COUNT XV – Violations of Lanham Act Against All Defendants...................................... 64

COUNT XVI – Violations of Lanham Act Against Defendant ICK ..................................... 65

COUNT XVII – Copyright Infringement Against Defendant ICK ........................................ 66

COUNT XVIII – Copyright Infringement Against Defendant Better Beverages ............... 67

COUNT XIX –Tortious Interference with Prospective Economic Advantage Against All
Defendants ....................................................................................................................... 68

COUNT XX –Unjust Enrichment Against All Defendants .................................................. 69

COUNT XXI –Common Law Conspiracy Against all Defendants ..................................... 70

PRAYER FOR RELIEF ...................................................................................................... 72

PLAINTIFFS DEMAND A BENCH TRIAL ON ALL ISSUES SO TRIABLE ..................... 73

## **INTRODUCTION**

2.      Plaintiff Mortal Ventures, LLC (hereinafter referred to as "MV") is a Boulder

Colorado consumer packaged drink company owned, and primarily operated by its

founder Ms. Rebecca Schepps. MV operates and owns all intellectual property relating

to a kombucha drinks product line known as Mortal Kombucha.

3.      MV launched Mortal Kombucha at the Boulder Farmers Market, in 2017, in

Boulder, Colorado.

4.      MV hired Mr. Matthew Miottel in 2020 to act as National Sales Director for

MV, through Mr. Miottel's wholly-owned entity MJM Sales Management, LLC

(hereinafter "MJM"), until June 2023. In June 2023, Defendant High Country Kombucha,

Inc. (hereinafter "Defendant HCK") engaged MJM/Mr. Miottel as a sales representative

for Mortal Kombucha after HCK and MV entered into a licensing arrangement described

in further detail herein.

5.      MV and MJM bring this action against Defendants for their extensive,

elaborate and unlawful conspiracy and scheme to misappropriate MV's entire Mortal

Kombucha line, including but not limited to its intellectual property, trade secrets,

proprietary manufacturing equipment, business customer lists and accounts, and

contracts for the purpose of developing their own kombucha company, utilizing MV's equipment and trade secrets and their further scheme to fraudulently evade the extensive debt they owed to MV, MJM and other creditors.

6.      Specifically, Defendant David Haertle, Defendant Joseph Haertle, Defendant Samantha Haertle, Defendant Jamie Haertle, Defendant HTL Investments LLC, and Defendant IC Bev Group LLC (collectively, the "Wisconsin Defendants") unsuccessfully attempted to acquire MV and its unique packaging technology during the spring of 2023. Upon Information and belief, after their failure to lawfully acquire the company, the Wisconsin Defendants devised a plan to steal MV intellectual property, physical assets, and redirect Mortal Kombucha sales profits to themselves through an aggressive takeover of Gypsum, Colorado based Defendant HCK, because, at the times material hereto, Defendant HCK was the sole manufacturer of Mortal Kombucha and had knowledge about how to operate a unique bottling machine owned by MV.

7.      After becoming a major shareholder of HCK, under information and belief, David Haertle acting as director of HCK installed his adult children, Joseph Haertle Jamie Haertle, and Defendant Samantaha Haertle, into executive positions at HCK to execute the family's plan.

8.      Defendants did not stop at mere misappropriation. Upon information and belief, Defendants conspired to avoid the payment of the substantial debts owed by HCK to numerous third parties, including both MV and MJM, under the fraudulent guise of an asset acquisition.

9.      Upon information and belief, the Wisconsin Defendants rely on a network of Wisconsin-based LLCs, general partnerships and misleading trade names in attempt

to obfuscate the flow of money that circulates through and between the various

operations and firms owned by the Wisconsin Defendants.

10.     Defendants, through these unlawful arrangements and actions, have

profited at the expense of MV and MJM.

11.     MV and MJM bring claims against Defendants for violations of the

Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*),

violations of the Economic Espionage Act (18 U.S.C. §§ 1832 *et seq.*), violations of the

Lanham Act (15 U.S.C. §§ 1114 and 1125), violations of the Copyright Act (17 U.S.C.

§501), violations of the Colorado Organized Crime Control Act (Colo. Rev. Stat. §§ 18-

17-101 *et seq.*), violations of the Colorado Uniform Trade Secret Act (Colo. Rev. Stat.

§§ 7-74-101 et seq.), fraud, conspiracy, tortious interference with prospective economic

relations, breaches of contract, violation of the duty of good faith and fair dealing, unjust

enrichment, conversion, replevin, and civil theft (Colo. Rev. Stat. §§ 18-4-401 and 18-4-

405).

12.     MV and MJM bring this action seeking the full measure of damages and

other remedies permitted by law.

## **PARTIES**

13.     Plaintiff Mortal Ventures LLC ("MV") is, and was at all times material

hereto, a Colorado Limited Liability Company, with its principal office located at 4663

Kirkwood St, Boulder, CO 80301.

14.     Plaintiff MJM Sales Management LLC ("MJM") is an Arizona Limited

Liability Company, with its principal office at 9949 E. Hidden Valley Rd., Scottsdale, AZ,

85262. At certain times material hereto MJM was known as MJM Management LLC, a

now dissolved California Limited Liability Company, with a principal office at 570 Ralston Ave., Mill Valley, CA, 94941. At all times material hereto MJM operated in the state of Colorado on behalf of HCK.

15.     Defendant High Country Kombucha, inc. dba Rocky Mountain Cultures AKA Better Beverages ("Defendant HCK") is, and was at all times material hereto, a Colorado corporation. HCK's principal office is located at 770 Lindbergh Dr., Unit #802, Gypsum, CO 81637.

16.     Upon information and belief, Defendant HTL Investments LLC ("Defendant HTL") is, and was at all times material hereto, a Wisconsin Limited Liability Company. Defendant HTL does not have a principal office street address identified in Wisconsin Corporate Records, and instead lists PO BOX 180511 Delafield, WI 53018

17.     Upon information and belief, Defendant IC Bev Group, LLC dba Island City Kombucha ("Defendant ICK") is, and was at all times material hereto, a Wisconsin Limited Liability Company. ICK does not have a principal office street address identified in Wisconsin Corporate Records, and instead lists PO BOX 18051 [sic] Delafield, WI 53018.

18.     Upon information and belief, Defendant Better Beverages LLC aka Better Beverages Group is, and was at all times material hereto, a partnership between Defendants with operations in Colorado and Wisconsin, and has directed Colorado third parties to send invoices bearing the addressee: Better Beverages LLC PO BOX 180511 Delafield, WI 53018. Undersigned counsel could find no registration of an entity related to the Defendants in the State of Colorado, Texas, Delaware, or Wisconsin.

19.    Upon information and belief, Defendant David S. Haertle is, and was at all times material hereto a resident of Wisconsin.

20.    Upon information and belief, Defendant Joseph C. Haertle is, and was at all times material hereto a resident of Wisconsin.

21.    Upon information and belief, Defendant Samantha Haertle is, and was at all times material hereto a resident of Wisconsin.

22.    Upon information and belief, Defendant Jamie Haertle is, and was at all times material hereto a resident of Wisconsin.

23.    Upon information and belief Defendant Shane Dickman is, and was at all times material hereto a resident of Colorado

24.    Upon information and belief, Defendant Marcus Gordon is a resident of Texas and was at all times material hereto a resident of either Texas or New York.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, by virtue of the federal questions involved herein.

26.    This Court also has original subject matter jurisdiction over this case pursuant to 15 U.S. § 1125 because the dispute involves matter in violation of the Lanham Act; 17 U.S.C. §501 because the dispute involves matters in violation of the Copyright Act; 18 U.S.C. § 1964 because the dispute involves matters in violation of the RICO Statute; 18 U.S.C. § 1836 because the dispute involves matters in violation of Economic Espionage Act.

27.    This Court has personal jurisdiction over individual Defendants because they are domiciled in Colorado and/or do business in Colorado.

28.     This Court has personal jurisdiction over individual Defendants under the

Colorado Long Arm Statute, Colo. Rev. Stat. § 13-1-124, by virtue of actions taken in

Colorado by individual Defendants, and the fact that MV, which has a business address

in Colorado, has been and will continue to be harmed by those actions.

29.     This Court has personal jurisdiction over all Defendants under 18 U.S.C.

§§ 1964(a) and 1965(a) and (d) because all Defendants either reside, are found, have

an agent, or transact business in Colorado.

30.      This Court has supplemental jurisdiction over the state law and other

claims herein, pursuant to 28 U.S.C. § 1367, arising from and involving the same

operative facts and circumstances.

31.     Venue is proper in Colorado under 28 U.S.C. §§ 1391 and 1400 because

a substantial part of the events or omissions giving rise to the claims in this Complaint

occurred in this district.

**FACTUAL BACKGROUND**

32.     Between 2017 and 2019, MV manufactured Mortal Kombucha in

Longmont, Colorado, and distributed it to vendors in the Boulder County area, including

the Boulder Farmers Market.

33.     Ms. Rebecca Schepps, a former professional athlete and trained graphic

designer, developed the recipes for the Mortal Kombucha product line and the notorious

and identifiable packaging. Her early success resulted in an increasing number of

vendor accounts, which necessitated moving production to a large co-packer by the end

of 2019.

34.     On November 18, 2019 MV and Defendant HCK entered into a Letter of Intent for Defendant HCK to co-pack Mortal Kombucha.

35.     Upon information and belief, MV and Defendant HCK undertook good faith efforts between the end of November 2019 to January 2020 to facilitate the co-packing of Mortal Kombucha by Defendant HCK under a standard co-packing arrangement; wherein MV would be responsible for all aspects of financing, marketing, selling, storing, and shipping Mortal Kombucha, and would pay Defendant HCK as a contractor on a per-order basis to produce Mortal Kombucha utilizing MV's confidentially-shared recipes.

36.     On January 22, 2020 Defendant Shane Dickman, on behalf of Defendant HCK returned via email edits to a proposed Co-Packing Agreement between MV and Defendant HCK. Specifically, Defendant Shane Dickman described the provision 13.1 "Language added is acceptable."

Provision 13.1 of the proposed Co-Packing Agreement, which matches the subsequently executed Co-Packing Agreement, includes language regarding MV's trade secrets, which reads

> *MORTAL owns all Product recipes and any improvements thereto (collectively the "Recipes"). Any modifications to the Recipes shall belong exclusively to MK, even modifications proposed by the Co-packer.*

37.     On January 24, 2020 Defendant HCK and MV entered into the Co-Packing Agreement. The duly executed Co-packing agreement contains the following Article 11:

_Confidential Information_.

*11.1   "Confidential Information" means all of the trade secrets, business and financial information, business methods, procedures, know-how and other information of every kind that relates to the business of either Party and is marked or identified as confidential at the time of disclosure, or disclosed in circumstances that would lead a reasonable person to believe such information is confidential. For purposes of clarity, the Recipes (defined below) are deemed to be the Confidential Information of MORTAL.*

*11.2   The Party receiving Confidential Information (the "Receiving Party") from the other Party (the "Disclosing Party") will: (a) treat as confidential and preserve the confidentiality of all such Confidential Information; (b) take the same degree of care to prevent disclosure of such Confidential Information as it takes to preserve and safeguard its own confidential or proprietary information, but, in any event, no less than a reasonable degree of care; (c) not copy, disclose or make available such Confidential Information (or permit others to do so) unless specifically authorized by Discloser; (d) limit access to such Confidential Information solely to its employees or contractors ("Representatives") who, prior to obtaining access to any Confidential Information have entered into a written nondisclosure agreement with each such individual that is no less protective of the Confidential Information than is this Agreement; and, (e) not disclose to any third person the existence or purpose of this Agreement. The Receiving Party will cause its Representatives to comply with the Receiving Party's obligations under this Agreement. If any Representative(s) discloses, accesses or uses Confidential Information other than as authorized in this Agreement, the Receiving Party will be liable to the Disclosing Party for such disclosure, access or use to the same extent that the Receiving Party would be liable to the Disclosing Party had the Receiving Party disclosed, accessed or used such Confidential Information.*

38.     On or around the beginning of March 2020, under information and belief, Defendant HCK began co-packing the purchase orders (hereinafter "PO") submitted by MV. The Co-Packing Agreement provided that MV would be responsible for all costs associated with materials, storage, freight, and advertising of Mortal Kombucha.

39.     On or around April 2020, MV scaled its Mortal Kombucha line by adding Whole Foods Market (hereinafter "WFM") as an account and using Defendant HCK as

its co-packer. (Hereinafter, retail vendors like Whole Foods Market, or Natural Grocers, are collectively referred to as "Retail Vendors").

40.     Under information and belief, at all times material hereto, Defendant HCK fraudulently represented to MV that it was using the ingredients identified in Ms. Rebecca Schepp's recipes for the production of Mortal Kombucha. Particularly, Defendant HCK represented that fruit purees were being used in Mortal Kombucha production runs, when in fact concentrates were being used substantially in the place of the fruit purees.  This fraudulent representation resulted in MV paying Defendant HCK for higher cost purees that were not in fact being used and Defendant HCK pocketing the difference between the cost of the purees and the cost of the less expensive concentrates.

41.     Under information and belief, Defendant HCK's fraudulent representation of ingredients also induced MV to approve inaccurate ingredient lists on the Mortal Kombucha labels.

42.     Under information and belief, at all times material hereto, Defendant HCK fraudulently represented that the nutrition labels for Mortal Kombucha had been calculated and tested. Particularly, Defendant Marcus Gordon fabricated the nutrition facts on behalf of Defendant HCK, thereby inducing MV to approve false nutrition labels on the Mortal Kombucha labels.

43.     Between spring and fall 2020, MV continued to grow its retail accounts through efforts by MJM, with  Mr. Matthew Miottel acting as MV's National Sales Director utilizing commercially standard supplier practices such as, but not limited to:

paying slotting allowances[1], advising MV on whether or not to agree to promotional

discounts favorable to retailers, and paying to ship Mortal Kombucha directly to retailers

from Defendant HCK's bottling plant in Gypsum, CO (hereinafter the "Bottling Plant").

44.    Similarly, MV set up supplier accounts with, *inter alia* national distributers

United National Foods, Inc (hereinafter "UNFI"), KeHE Distributors, LLC ("KeHE"), C&S

Wholesale Grocers, LLC to fulfill orders for Mortal Kombucha and distribute to the Retail

Vendors, (collectively, hereinafter the "Distributors").

45.    Through sales efforts undertaken by MV and MJM, Mortal Kombucha

became a nationally distributed product within months of entering into the co-packing

agreement with Defendant HCK. The success of Mortal Kombucha resulted in MV

having internal discussions about expanding product lines to differentiate Mortal

Kombucha from its competitors and acquire advantageous "slots" (i.e. shelf space) in

more retail locations.

46.    On or around the September 2020, MV began having internal discussions

on whether or not to pursue bottling Mortal Kombucha in aluminum, rather than the

contemporaneously used glass bottles. Ms. Rebecca Schepps' aim was to create a

reusable, re-sealable and environmentally friendly aluminum bottle to distinguish Mortal

Kombucha from other glass and aluminum can kombucha offerings on the shelf.

47.    Specifically, in a September 15, 2020 email, Ms. Rebecca Schepps

identified aluminum containers as an avenue to get shelf space in Retail Vendors,

including stores such as Sprouts Farmers Market, (hereinafter "Sprouts").

---

[1] Slotting allowances are paid to grocery retailers to secure shelf space for products.

48.     Ms. Schepps identified, *inter alia*, a Strawberry Basil flavor she had formulated in summer of 2019 as a candidate for an aluminum bottle.

49.     Throughout the fall of 2020 to the fall of 2021 MV increased its sales footprint for Mortal Kombucha, and overall gross sales; all while absorbing increased costs due to inflationary pressures and supply chain issues; costs that were passed on by Defendant HCK.

50.     Under information and belief, at least some of the pricing changes represented to MV by HCK to be caused by these inflation and supply chain issues were fraudulent, intended to induce MV to pay more money for ingredients either not used in Mortal Kombucha products, or lacking the requisite Organic certifications.

51.     As result of Defendant HCK's fraudulent representations regarding pricing changes, MV agreed to pay more money to Defendant HCK to continue producing Mortal Kombucha.

52.     On or about September 2022 MV delivered samples of 16-ounce Ball resealable aluminum bottles, bearing the Mortal Kombucha labels and registered trademarks, to Sprout's, resulting in extremely positive reception by the retailer.

53.     On or about September 28, 2022 Ms. Rebecca Schepps emailed Defendant Shane Dickman requesting information on next steps to effectuate the bottling of Mortal Kombucha in 16oz Ball-style bottles at the Bottling Plant.

54.     On or about September 28, 2022 Defendant Shane Dickman replied to Ms. Rebecca Schepps email indicating that Defendant HCK would need to add a "double-pass ROPP capper" to the bottling line at the Bottling Plant in order to bottle Mortal Kombucha in the 16oz Alumi Tek resealable bottles.

55.     In a follow-up email regarding the same discussion as the September 28, 2022 emails chain, *infra*, Defendant Shane Dickman indicated that once MV had sourced Alumit Tek 16oz bottles and labels, then "we can tackle the capper next."

56.     On or about the third week of October 2022, Ms. Rebecca Schepps delivered financing information to a lender in order to secure funding to purchase the ROPP capper to bottle Mortal Kombucha in Alumi Tek bottles.

57.     On or about October 18, 2022, Ms. Rebecca Schepps emailed Defendant Shane Dickman indicating that MV was seeking financing to acquire a ROPP capper, and inquired as to whether or not Defendant HCK would split the cost of the ROPP capper with MV, or entertain some other financial co-venture between the parties.

58.     On or about October 18 2022, Defendant Shane Dickman responded to Ms. Rebecca Schepps indicating Defendant HCK could not afford to purchase a ROPP capper in the timeline required by MV. Likewise, Defendant Shane Dickman stated that other private label customers of Defendant HCK (i.e. other entities engaged to co-pack and/or license to Defendant HCK for manufacturing), would not likely take the risk of the new and un-tested resealable aluminum bottles MV was pursuing.

59.     Instead, in the October 18, 2022 email, Defendant Shane Dickman stated that if MV were to purchase and pay to install the ROPP capper at the Bottling Plant, the ROPP capper would be used exclusively for producing Mortal Kombucha for MV.

60.     Induced by Defendant Shane Dickman's statements about Defendant HCK's inability to afford the ROPP capper and need for immediate exclusive use, Ms. Rebecca Schepps entered MV into a loan agreement in order to purchase a Zalkin,

14

Model TM-200 Fully Automatic Single-Head ROPP Capper, and associated custom-engineered parts (collectively, "MV's Capper").

61.     Likewise, on or about the third week of October 2022, Ms. Rebecca Schepps sourced boxes, and began looking for the requisite "G3" caps compatible with the 16oz Alumit Tek bottles.

62.     On or about of November, 2022 MV identified and sourced the G3 caps for MV's Capper.

63.     Under information and belief, on or about of November, 2022 Defendant Shane Dickman connected MV with Morrison Container Handling Solutions (hereinafter "Morrison"), an industrial engineering firm, in order for MV to hire Morrison to properly modify MV's Capper so that could accept the G3 caps. (000064).

64.     On or about December 16, 2022 Defendant HCK mistakenly received a quote from Morrison for the specialized engineered change parts to make MV's Capper work with the G3 caps.

65.     On or about December 16, 2022, Defendant HCK forwarded said quote from Morrison to Ms. Rebecca Schepps directing MV to put in a PO and send a credit application to Morrison in order to maintain the timeline MV and Defendant HCK had agreed on.

66.     On or about December 20, 2022 MV engaged with an insurance broker to insure MV's Capper and associated components. On or around January 2023, MV acquired insurance for the ROPP capper in connection with the loan agreement.

67.     Induced by Defendant Shane Dickman's statements and emails confirming the ownership and exclusive use of MV's Capper, Ms. Rebecca Schepps

submitted and paid the PO for the Morrison change parts to make the G3 caps work on

MV's Capper, with an expected ship date to the Bottling Plant of February 22, 2023.

68.     On or around early December 2022, MV fell behind on payments due to

Defendant HCK as a result of the timing of payments to Defendant HCK (30-day net)

versus timing of payment to MV from the Distributors (90-day net).

## WISCONSIN DEFENDANTS' TIES TO COLORADO

69.     On or about the end of 2022 and the beginning of 2023, under information

and belief, Mr. Matthew Miottel communicated with Defendant David Haertle about Mr.

Haertle's ongoing attempts to secure a broker for a kombucha company recently

acquired by Defendant David Haertle; the newly acquired kombucha company being a

project for his children Defendant Samantha Haertle, Defendant Joseph Haertle, and

Defendant Jamie Haertle.

70.     Understanding MV's liquidity constraints, on or around January 23, 2023

Mr. Matthew Miottel introduced Defendant David Haertle to Ms. Rebecca Schepps in an

attempt to facilitate liquidity for MV to meet the operational overhead needed to meet

growing demand for Mortal Kombucha.

71.     On or about January 27, 2023, under information and belief, Defendant

David Haertle disclosed that Wisconsin Defendants had recently acquired a kombucha

company that was limited to regional sales in Wisconsin; and further, that the Haertle

family was planning on winding down operations at a loss. Under information and belief,

the kombucha company the Wisconsin Defendants had acquired was Tapuat, LLC.

72.     On or about January 29, 2023 Defendant David Haertle delivered a signed

Non-Disclosure Agreement to Ms. Rebecca Schepps via email in order to progress the

due diligence efforts of Defendant HTL to make an offer to acquire equity in MV, (hereinafter the "HTL Non-Disclosure Agreement").

73.    The HTL Non-Disclosure Agreement included the following language:

*"… Confidential Information includes, but is not limited to, information about or samples of, as appropriate, compounds, the physical and chemical characteristics of compounds, product specifications, manufacturing processes and operations, compositions, formulations, formulation techniques, analytical methodology, safety and efficacy data, testing data, future market and product plans, marketing and financial data, drawings, designs, knowhow, ideas and other information of a technical, scientific, or economic nature related to the Subject Matter."* (000066).

74.    On February 8, 2023 Ms. Rebecca Schepps responded to Defendant David Haertle's request for more information regarding MV. In that email, Ms. Rebecca Schepps disclosed the name of MV's co-packer, Defendant HCK. Likewise, in the same communication Ms. Rebecca Schepps disclosed MV's future market and product plans and the utilization of MV's Capper, which would make Mortal Kombucha the first retail kombucha sold in resealable aluminum containers.

75.    On or about February 10, 2023 to February 12, 2023 Defendant David Haertle exchanged emails with Ms. Rebecca Schepps regarding Defendant HTL's due diligence. Upon information and belief, on a February 10, 2023 email, Defendant Davd Haertle estimated that Mortal Kombucha could reach sales of approximately $2 million dollars by 2024. Upon information and belief, in a subsequent email of the same chain, Defendant Davd Haertle wrote the following:

*"…- you mentioned in our prior conversations the bottling contractor is planning a pilot run on the aluminum bottle this week or next . [sic] If this is the case , [sic] are you planning on being present and if so could one of our people join you for the day? We obviously think the aluminum bottle is the key to success and a close up look at the pilot run along will certainly assist us in better understanding the viability of the project . [sic]"*

76.    On or about March 1, 2023 Defendant Joseph Haertle traveled to the Bottling Plant in connection with Defendant HTL's due diligence regarding MV.

77.    On or about March 1, 2023 Ms. Rebecca Schepps delivered MV financial data, market and financial data, as well as specific information on the Alumi Tek bottle pricing and manufacturing to Defendant Joseph Haertle in connection with Defendant HTL's purported due diligence.

78.    On or about March 7, 2023 Defendant HTL delivered a Term Sheet (hereinafter the "Term Sheet") to MV in connection with tentative offer to purchase a majority stake in MV for $200,000. to close by April 7, 2023.  Specifically, the term sheet limited the use of the investment proceeds to the "aluminum bottle product launch." Upon information and belief, on March 8, 2023 Defendant Joseph Haertle sent an email stating that Defendant HTL intended to compensate the Haertle family via a 'management fee', funded by MV revenues *after* acquiring 51% of MV.

79.    On or about March 8, 2023 Ms. Rebecca Schepps replied to a request by Defendant Joseph Haertle and Defendant David Haertle to provide additional MV information consisting of confidential business projections and plans. Ms. Rebecca Schepps shared, among other information, financial datasets as well as the formulas and equations contained within spreadsheets developed by MV to project costs and thereby estimate appropriate slotting allowances and promotional discounts to gain retail accounts for the aluminum bottle product line.

80.    Under information and belief, Defendant Jospeh Haertle and Defendant David Haertle represented to Ms. Rebecca Schepps on or about March 22, 2023, that a subsequent offer, materially different from the Term Sheet, based on additional financial

and analytical methodologies provided by MV, would be forthcoming, in response to Ms.
Rebecca Schepps refusing the terms of the Term Sheet, which she believed to be one-
sided and fundamentally unfair to MV investors.

81.    Under information and belief, on or about April 5, 2023 Defendant Jospeh
Haertle wrote to Ms. Rebecca Schepps that Defendant HTL would provide a different
proposal to acquire MV equity. Under information or belief neither Defendant Joseph
Haertle, nor any other of the Wisconsin Defendants, made a follow-up proposal to
acquire MV.

82.    On or about April 6, 2023 Defendant Joseph Haertle emailed Mr. Matthew
Miottel asking how to appropriately apply promotions for the Alumi Tek bottles
manufactured on MV's Capper. Mr. Matthew Miottel, acting in good faith on the belief
that Defendant HTL may still acquire MV, responded clarifying how MV applies
promotions to the glass bottles as well as MV's intended promotions for the aluminum
bottles.

**MV AGREES TO LICENSE MORTAL KOMBUCHA TO DEFENDANT HCK**

83.    With the uncertainty surrounding the ability to reach agreement with
Defendant HTL, under information and belief, on or about March 24, 2023 MV and
Defendant HCK entered into discussions in connection with Defendant HCK licensing
MV's Mortal Kombucha intellectual property, as well as Defendant HCK taking over the
Mortal Kombucha Retail Vendor accounts currently managed by MV.  Under this
arrangement, Defendant HCK would manage sales and manufacturing and MV would
receive royalites in exchange for the license grants to Defendant HCK. Ms. Rebecca
Schepps saw this arrangement as mutually advantageous in that Mortal Kombucha

continued to be well received in the marketplace and she believed (at the time) that HCK had the financial means to support a much larger sales effort.

84.    Under information and belief, on or about April 1, 2023 MV delivered sales data to Defendant HCK demonstrating Mortal Kombucha sales totaling approximately $700,000 dollars for the period of March 30, 2022, to March 30, 2023.

85.    On or about May 8, 2023 Ms. Rebecca Schepps began communicating with Defendant HCK about the likelihood of Defendant HCK continuing to produce open orders for Mortal Kombucha while the licensing arrangement was being negotiated. Ms. Rebecca Schepps engaged Defendant HCK in this discussion because, under information and belief, at the time, MV owed about $80,000 to Defendant HCK, however MV was owed approximately $115,000 in outstanding payables by several Distributors, the offset being caused by a difference between net 30 payment terms to Defendant HCK and net 90 payment terms of payment to MV from the Distributors. Defendant HCK agreed that production of Mortal Kombucha could continue as MV's outstanding obligations could be resolved and or relieved by a combination of outstanding receipts from the Distributors, and by finalizing the Licensing Agreement.

86.    Under information and belief, on or about May 9, 2023, in response to a notice from Ms. Rebecca Schepps about unfilled PO's, Defendant Marcus Gordon, Vice President of sales for Defendant HCK, emailed Ms. Rebecca Schepps asking for information about the unfilled POs so that he could push the production team to manufacture Mortal Kombucha on time. Ms. Rebecca Schepps responded with a table indicating over $45,000 of unfilled POs due within approximately the next 30 days – the

information was provided in connection with establishing a timeline for Defendant HCK

to begin licensing Mortal Kombucha instead of under the Co-Packing Agreement.

87.     On or about May 10, 2023 Ms. Rebecca Schepps sent a redlined draft of a

proposed licensing agreement to Defendant HCK.

88.     Despite the agreement to finance the open POs while the parties finalized

the licensing arrangement, under information and belief, Defendant HCK failed to

produce Mortal Kombucha for substantially all customer orders during this time.  Under

information and belief, as a result, on or about May 18, 2023 Ms. Rebecca Schepps

wrote to Defendant HCK asking if MV needed to notify Distributors and Retail Vendors

about the potential for certain Mortal Kombucha products to be listed as out of stock.

Under information and belief, Defendant Shane Dickman replied that Defendant HCK

could no longer finance MVs orders to fill the POs.

89.     On or around May 22, 2023 MV and Defendant HCK discussed, and again

agreed, that in exchange for Defendant HCK to continue to finance production of Mortal

Kombucha for open orders with current Retail Vendors and for Distributor contracts,

Defendant HCK would maintain those relationships and contracts once the proposed

license agreements closed, and that the cost of Defendant HCK's financing would be

credited from royalties payable to MV under the Licensing Agreement.

90.     Under information and belief, the retention of the Retail Vendor and

Distributor contracts for Mortal Kombucha resulted in significant savings for Defendant

HCK because, with the exception of the Sprouts' account, MV had already gained and

paid for the slotting allowances per Stock Keeping Unit (or SKU) required by Retail

Vendors to place Mortal Kombucha on the grocery store shelf.

91.    Under information and belief, retention of the relationships and contracts

with the existing Distributors and Retail Vendors for use by Defendant HCK resulted in

tens of thousands of dollars in savings to Defendants HCK and also extended MV's

goodwill via Mr. Matthew Miottel to Defendant HCK via a Partnership Announcement.

92.    On or about May 23, 2023, under information and belief, Defendant HCK

caused a production run of the Alumi Tek bottles containing Mortal Kombucha.  Under

information and belief, this initial run was to produce a sample of Mortal Kombucha in

aluminum bottles for Sprouts.

93.    On or about May 25, 2023 Defendant HCK and MV entered into an

exclusive, royalty-bearing, non-transferable, non-assignable, Licensing Agreement for

Mortal Kombucha and the associated intellectual property, (hereinafter the "Licensing

Agreement"). Upon information and belief, Defendant HCK would take control of MV's

outstanding Retail Vendor and Distributor accounts, as well continue to move forward

with MV regarding the launch of the aluminum Mortal Kombucha line with Sprouts.

94.    The executed Licensing Agreement contains the following language:

> *"Licensor is the sole and exclusive owner of certain intellectual property rights, including, without limitation, inventions, ideas, processes, recipes, customer formulations, technology, trademarks, trade-dress, trade names, and registrations …"*

95.    Pursuant to the Licensing Agreement, and the previous coverage of the

Co-Packing Agreement, MV was the sole owner of the formulas for Strawberry Basil,

Watermelon Mint, and Blackberry Sage Ginger, and that such recipes were trade

secrets, and were to be treated as confidential.

96.    Under information and belief, Defendant HCK and MV agreed that MJM,

through Mr. Matthew Miottel, would act as a sales broker under Defendant HCK, no

longer for MV. Under information and belief, in connection with Defendant HCK and MV
entering into the Licensing Agreement as of June 1, 2023, Defendant HCK and MJM
entered into a master broker agreement (hereinafter the "Broker Agreement") with an
effective date of May [sic] 1, 2023. (000021).  The Broker Agreement provided that Mr.
Matthew Miottel would be paid a monthly retainer, commission on sales and certain
other bonus payments for attaining points of distribution at Retail Vendors.

97.    On or about June 5, 2023 MV and Defendant HCK began notifying Retail
Vendors and Distributors that Defendant HCK would become responsible for supplying
Distributors and Retail Vendors. Furthermore, the written notice included language
indicating Mr. Matthew Miottel would continue on in a sales role for Defendant HCK.

98.    On or about June 7, 2023 Defendant Shane Dickman notified Ms.
Rebeccas Schepps that despite the effect of the Licensing Agreement, MV would still
need to pay to run production of Mortal Kombucha to meet outstanding POs. Relying on
Defendant Shane Dickman's statements, on or about June 7, 2023 Ms. Rebecca
Schepps submitted an order for production to Defendant HCK for an amount of
$65,698.08.

99.    On or about June 7, 2023, MV and MJM began making good faith efforts
to transfer the Distributor and Retail Vendor contracts to Defendant HCK. Once these
contracts were transferred, all payments for Mortal Kombucha products were sent
directly to HCK; MV no longer had visibility into distribution and customer payment
amounts.

100.    Inexplicably, Defendant HCK failed to initiate production under the
Licensing Agreement for several months and despite MV having already transferred all

payments for sales of Mortal Kombucha to Defendant HCK. As a result, Defendant HCK
forced MV to continue to finance production runs of Mortal Kombucha in order to meet
unfilled POs and avoid losing critical slots at Retail Vendors.  Invoices presented to MV
from June 7, 2023, June 29, 2023, July 10, 2023, August 8, 2023, and August 15, 2023,
totaled $75,567.33.

101.    Under information and belief, in connection with the payments for
productions runs with invoice dates of June 7, 2023 June 29, 2023, July 10, 2023,
August 8, 2023, and August 15, 2023, Defendant HCK intentionally (i) failed to schedule
production of Mortal Kombucha, and (ii) de-scheduled previously scheduled production
dates. In sum, Defendant HCK did not produce Mortal Kombucha on the dates
represented by the invoices, while simultaneously representing that such production
was occurring, resulting in a material misrepresentation of costs associated to run
production of Mortal Kombucha.

102.    Between June 2023 and August 2023, MV continued to pay for, and
coordinate freight shipping to fill open PO's in order to protect MV's positive public
brand reputation and goodwill amongst Retail Vendors and Distributors.

103.    On or about June 29, 2023, and July 5, 2023 MJM reached out to
Defendant Marcus Gordon about whether or not samples of Mortal Kombucha in
aluminum bottles had been sent to various Retail Vendors, under information and belief,
Defendant Marcus Gordon never replied.

104.    As result of Defendant HCK's failure to produce Mortal Kombucha in
June 2023, on or about July 7, 2023 MJM notified Defendant HCK that the June
production failure caused a failure to deliver orders of Mortal Kombucha to the

Distributors, resulting in empty shelves at WFM, thereby risking loss of the slot MV had paid for and delivered to Defendant HCK in connection with the Licensing Agreement.

105.    On or about August 7, 2023 Ms. Rebecaa Schepps ordered aluminum bottles for the initial production run of Mortal Kombucha using MV's Capper at the Bottling Plant. Ms. Rebecca Schepps created the order for the aluminum bottles but assigned Defendant HCK the billing pursuant to the Licensing Agreement.

106.    On or around August 8, 2023 MV received notice that Defendant HCK had shipped Mortal Kombucha past the deliverable expiration deadline. Under information and belief, Defendant HCK intentionally shipped Mortal Kombucha that had been produced in April and/or May 2023, attempting to fraudulently pass-off said shipment as having been more recently produced under at least one of the following invoices: June 7, 2023, June 29, 2023, and/or July 10, 2023.

107.    Under information and belief, in late summer of 2023, Defendant Marcus Gordon told Mr. Matthew Miottel that Defendant HCK could begin fully running production of Mortal Kombucha pursuant to the Licensing Agreement explaining that, because Defendant had received POs from 7-Eleven, Inc. ("7-11") to produce private-label beverages, Defendant HCK could 'factor' those 7-11 POs.  Under information and belief, Defendant HCK was "PO Factoring" thereby taking out a loan advance on unfilled POs, effectuated by sending Bills of Lading ("BOL") to the lender in order to cover the costs associated with performing the production runs.

108.    Under information and belief Defendant HCK began factoring Mortal Kombucha POs sometime in the summer of 2023 in order to cover overhead and operational costs unrelated to the production of Mortal Kombucha.

109.    On or about September 16, 2023 Defendant HCK began independently producing and shipping Mortal Kombucha pursuant to the Licensing Agreement.

110.    On or about September 28, 2023 Defendant HCK sent a notice of amounts owed by MV to Defendant HCK regarding POs from summer of 2023. Under information and belief, MV owed approximately $33,571.20 to Defendant HCK from production runs of Mortal Kombucha between March 2023 and May 2023, and $83,724.78 from after the effective date of the Licensing Agreement: between June 2023 to August 2023.

111.    On or about October 5, 2023, per her agreement with Defendant Shane Dickman, Ms. Rebecca Schepps instructed Defendant HCK's bookkeeper to track the royalties owed to MV pursuant to the Licensing Agreement and credit the debt owed by MV to Defendant HCK from those royalties.

112.    Under information and belief between the summer of 2023 and May 2025, in connection with taking over Retail Vendor and Distributor accounts, Defendant HCK by and through its agents Defendant Marcus Gordon, Defendant Shane Dickman, and contractor MJM (at the direction and under the supervision of Defendant Marcus Gordon), approved any and all promotions for Mortal Kombucha.

113.    On or about December 7, 2023 Ms. Rebecca Schepps received notice of Mortal Kombucha's aluminum bottle packaging having made it to the finals of the TricorBraun Packaging Awards.

114.    Between February 2, 2024 to May 20, 2024 Ms. Rebecca Schepps repeatedly requested Royalty Statements pursuant to section 2(c) the Licensing Agreement.

*Royalty Statements. With each Royalty Payment, Licensee shall submit to Licensor a Written royalty statement in the form attached hereto as Exhibit _____. [sic] Such royalty statement shall be certified as accurate by Licensee's CEO or other officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period.*

115.    Under information and belief, in response to Ms. Rebecca Schepps requests Defendant Shane Dickman attempted to coerce MV into accepting incomplete payments by supplying statement documents that improperly deducted Defendant HCKs operating costs from the royalty calculations. Under information and belief, when confronted with the clear language of the Licensing Agreement, Defendant Shane Dickman simply stopped responding to Ms. Rebecca Schepps questions.

116.    Under information and belief sometime in 2024 Defendant Shane Dickman and Defendant Marcus Gordon solicited H-E-B Grocery Company, LP (hereinafter "HEB") in connection with producing private label kombucha to be sold in HEB stores and HEB's wholly-owned subsidiary Central Market, bearing a "Central Market" label.

117.    Under information and belief Defendant HCK, directed by Defendant Shane Dickman and Defendant David Haertle (whose involvement is further described below), began producing kombucha products for HEB using MV's trade secret-protected recipes for Strawberry Basil, Watermelon Mint, and Pear Ginger, and subsequently resulting in those products being delivered to and sold in HEB and Central Market stores.

118.    Under information and belief, sometime in 2024 Defendant HCK, Defendant Shane Dickman, and Defendant Marcus Gordon began advertising and

using MV's Capper and other proprietary information related thereto to bottle drinks without informing MV or seeking its consent to do so in violation of the promises Defendant Shane Dickman made to Ms. Rebecca Schepps in connection with her purchase and financing of the capper. Under information and belief, such advertising and use continues as of the date of filing of this Complaint.

## WISCONSIN DEFENDANTS' INVOLVEMENT IN DEFENDANT HCK

119.    Unbeknownst to the Plaintiffs, Defendant HCK was in financial distress and had amassed large amounts of debt, including substantial IRS liabilities.  Under information and belief, also unbeknownst to Plaintiffs, Defendant David Haertle, who had been introduced to Defendant HCK through his due diligence of MV, acquired a major share of Defendant HCK's stock, and retained a seat as a Director of Defendant HCK in the spring of 2024. Under information and belief, on or around the spring of 2024, Defendant Marcus Gordon and Defendant Shane Dickman, in connection with Defendant David Haertle's role as a major shareholder and director of Defendant HCK, began to deliver trade secrets and other propriety information including, at least MV's Strawberry Basil, Pear Ginger, and Watermelon Mint recipes, and MV's customer lists, which in turn were provided to, at least, Defendant ICK (owned by the Wisconsin Defendants) , in order to expand Defendant ICK's operation and sales territory.

120.    On or about August 19, 2024 Defendant Shane Dickman requested information about MV's Capper and the financing in connection with Defendant HCK's interest in acquiring the MV's Capper.

121.    Under information and belief, Defendant David Haertle directed Defendant HCK to produce Defendant ICK's kombucha products, and other white label products in

lieu of Mortal Kombucha. Under information and belief, Defendant David Haertle and
Defendant Shane Dickman directed delays of Mortal Kombucha production, and
withholding of royalites throughout spring and summer of 2024 in order to pressure Ms.
Rebecca Schepps to renegotiate the terms of the Licensing Agreement.

122.    On September 27, 2024 there were over $200,000 worth of unshipped
POs due to KeHE, the distributor that supplied Mortal Kombucha to Sprouts. MJM
notified Defendant Marcus Gordon of the issue, via email; such unshipped POs
presented significant risks to MV's goodwill and reputation as well as forfeiture of
business already contracted by MJM.

123.    Under information and belief, sometime in the fall of 2024, the Wisconsin
Defendants directed Defendant Marcus Gordon and Defendant Shane Dickman to omit
material operational and financial matters substantive to both MV and MJM, and
instead, while outwardly representing their good-faith efforts to perform, they had no
actual plan or schedule to produce Mortal Kombucha under the Licensing Agreement.
Their tactics were intended to manipulate MV into renegotiating the Licensing
Agreement to Defendants' benefit or drive Mortal Kombucha out of business, which
would pave the way for expanded sales of Defendant ICK's kombucha.

124.    In response to an MJM email September 27, 2024 Defendant Marcus
Gordon materially misrepresented that Defendant HCK would ship "all open KeHe orders"
on the next Tuesday, 5 days away, and that "everything was headed in the right
direction." Defendant Marcus Gordon also stated that additional aluminum bottles had
been ordered for future Mortal Kombucha production runs.

125.    Under information and belief, said additional aluminum bottles were actually used for Defendant ICK's kombucha, under direction from the Wisconsin Defendants, and specifically Defendant David Haertle acting as director of Defendant HCK, thereby further delaying Mortal Kombucha production and shipment throughout summer of 2024.

126.    Under information and belief. Defendants failed to produce and ship a substantial portion of the "open orders" for KeHE in the fall of 2024.

127.    In late September 2024, MV contacted Defendant Marcus Gordon about Defendant HCK's delays and/or failure to produce and ship any Mortal Kombucha in the latter half of July, and all of August 2024, and the imminent risk of losing Sprouts shelf slots among others, further harming MV's goodwill and brand reputation.

128.    On or about October 23, 2024 Defendant Marcus Gordon emailed Ms. Rebecca Schepps regarding the unpaid royalites and credit from the claimed debt owed by MV to Defendant HCK. Said email also included a material misrepresentation of costs associated with additional parts for MV's Capper, which under information and belief were actually Morrison labor charges related to service of Defendant HCK's production line at the Bottling Plant.

129.    In the October 23, 2024 email, in addition to the PO debt owed by MV, Defendant Marcus Gordon listed deductions against the royalty total owed by Defendant HCK, such deductions were not contemplated by the Licensing Agreement, and are disputed by MV. Under information and belief, the deductions were used in an attempt to coerce Ms. Rebecca Schepps into amending the Licensing Agreement at the behest of Defendant David Haertle and Defendant Shane Dickman.

130.    Also, throughout the fall of 2024 Defendant HCK's bookkeeper and
Defendant Marcus Gordon, at the direction of Defendant Shane Dickman and
Defendant David Haertle, represented that MV owed a "debt repayment sum in
connection with the alleged productions runs having the invoice dates June 7, 2023
June 29, 2023, July 10, 2023, August 8, 2023, and August 15, 2023. Under information
and belief, as outlined above, Defendant HCK made material misrepresentations about
said production runs in summer of 2023, and also in the fall of 2024, and attempted to
induce Ms. Rebecca Schepps into paying for production that substantially never
occurred based on invoices prepared by Defendant HCK, and delivered via email to MV
in the summer of 2023, and re-delivered in the fall of 2024.

131.    In response to Defendant Marcus Gordon's October 23, 2024 email Ms.
Rebecca Schepps disputed the amount due, declined to amend the Licensing
Agreement, and requested to audit Defendant HCK's invoices pursuant to Section 4 of
the Licensing Agreement:

*4. AUDIT.*

*A. Licensor shall have the right during the Term of this Agreement and for
at least one (1) year after termination or expiration, upon at least thirty (30)
days written notice and no more than once per calendar year, to inspect
Licensee's books and records and all other documents and material in the
possession of or under the control of Licensee with respect to the subject
matter of this Agreement at the place or places where such records are
normally retained by Licensee. Licensor shall have reasonable access
thereto for such purposes and shall be permitted to make copies thereof
and extracts therefrom. Each audit shall be limited to the twelve month
period immediately prior to the written notice requesting such audit.*

132.    Defendant HCK ignored Ms. Rebecca Schepps' request for an audit
thereby failing to perform under Section 4 of the Licensing Agreement.

133.    In early November 2024, Ms. Rebecca Schepps requested information

regarding royalty payments pursuant to the Licensing Agreement for the third quarter of

2024.

134.    In connection with Defendant Marcus Gordon's October 23, 2024

statements, and under the direction of Defendant David Haertle acting as director of

Defendant HCK, Defendant HCK delivered $26,625.49 to MV in a series of bank

transfers.

135.    Between December 19, 2024 and January 9, 2025, MJM solicited Stop &

Shop Supermarket Company (hereinafter "Stop & Shop"), successfully getting slotting

for Mortal Kombucha at the retailer.

136.    Due to the exclusive nature of the Licensing Agreement, and significant

delays and lack of production through the summer, fall, and early winter of 2024, on or

about December 30, 2024 Ms. Rebecca Schepps requested information regarding

whether or not Defendant HCK planned on continuing to operate under the Licensing

Agreement and again requested the financial audit information pursuant to the

Licensing Agreement.

137.    On or about January 6, 2025 Defendant Shane Dickman told Ms. Rebecca

Schepps via email that Defendant HCK wanted to continue working with MV, and that

he would deliver royalty statements to MV.

138.    Under information and belief, Defendant Shane Dickman's statements

were intended to induce MV's continued reliance on Defendant HCK as an exclusive

licensor, despite knowledge that Defendant David Haertle had already coerced

Defendant Shane Dickman, Mr. Steve Dickman, and Mr. CEO Edward Rothbauer–the

majority shareholders of Defendant HCK,  into transferring materially all of the assets
and contracts of Defendant HCK to the control of Defendant HTL and the Wisconsin
Defendants, necessitating the need for MV to enter into a materially different licensing
agreement.

139.    On or about January 15, 2025 Defendant Marcus Gordon told Ms.
Rebeccas Schepps, that Defendant Shane Dickman, Mr. Steve Dickman, and Mr.
Edward Rothbauer were no longer in control of the company, and that Defendant David
Haertle had requested that MV and Defendant Better Beverages enter into a new
agreement.

140.    On January 23, 2025 Ms. Rebecca Schepps emailed Defendant Marcus
Gordon and Defendant Shane Dickman demanding accurate royalty statements
stemming from the time period of June to December 2024.

141.    In response, between January 24 and January 30, 2025 Defendant
Marcus Gordon exchanged emails with Ms. Rebecca Schepps related to Defendant
HCK's records of sales data in connection with the yet-to-be produced MV Royality
Statements. Defendant Marcus Gordon's emails, induced Ms. Rebecca Schepps to
believe Defendant HCK was making good faith efforts to make royalty payments.

## WISCONSIN DEFENDANTS ACQUIRE DEFENDANT HCK

142.    On February 1, 2025 Defendant HCK and Defendant HTL issued a formal
statement (hereinafter the "Press Release") stating the following:

> "…We are writing to inform you that effective of February 1, 2025, Rocky
> Mountain Cultures [the tradename of HCK] has agreed to be acquired by
> HTL Investments. As part of the transaction, the newly formed entity will
> operate under the new name, Better Beverages, LLC. This is an exciting
> development for our business, and we want to assure you that there will be

*no changes to our existing relationship or any of our current agreements. The management team, staff, and all current business practices will remain intact. This acquisition allows us to access additional resources that will support our future growth while maintaining the core values that have made our business successful…."*

143.    Pursuant to Section 1 of the Licensing Agreement, the agreement was non-transferable and non-assignable. As such, the Licensing Agreement was materially breached by Defendant HCK on February 1, 2025 and constructively terminated. As of February 1, 2025, pursuant to Section 14(C) of the Licensing Agreement, neither Defendant HCK, Defendant HTL, nor any of the other Wisconsin Defendants carried any rights to continue producing or advertising Mortal Kombucha:

> *Upon the expiration or termination of this Agreement, all of the rights of Licensee*
> *under this Agreement shall forthwith terminate and immediately revert to Licensor and Licensee shall immediately discontinue all use of the Mortal IP at no cost whatsoever to Licensor.*

144.    Neither MV, nor MJM (i) were formally notified of the corporate changes to Defendant HKC, or (ii) were contemporaneously provided the Press Release, nor did Defendant HCK perform under Section 14(A) of the Licensing Agreement:

> *A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, to the extent applicable, Licensee shall provide Licensor with a complete schedule of all inventory of Licensed Products then on-hand (the "Inventory").*

145.    On February 17, 2025 Ms. Rebecca Schepps emailed Defendant Marcus Gordon and Defendant Shane Dickman inquiring about the still yet unproduced Royalty Statements.

146.    In response to an escalating frequency of issues regarding Defendant HCK's inability to make retainer payments to MJM, on March 3, 2025 MJM gave notice to Defendant HCK, Defendant David Haertle, Defendant Marcus Gordon and Defendant

Shane Dickman of the termination of the Broker Agreement due to failure of Defendant HCK to pay certain outstanding retainer payments, commission that was owed since the effective date of the Broker Agreement and other bonuses owed under the contract equal to at least $67,226.44.

147.    On March 13, 2025 Mr. Matthew Miottel sent another email to the same, demanding that MJM be paid for work that have been done in December 2024, January 2025, and February 2025, the retainer owed for two months following notice of termination (owed pursuant to the contract), outstanding commission and other amounts owed, of which Defendant HCK had failed to timely pay.

148.    In response to Mr. Matthew Miottel's email, Defendant Daivd Haertle responded on March 13, 2025 on behalf of Defendant HTL, that Defendant HTL only purchased the "assets" of Defendant HCK, and was therefore not liable for any debt owed by Defendant HCK to MJM. In a follow-up email Defendant David Haertle admitted that he had "stepped in" because Defendant HCK was "days away from being shut down by a creditor"; MV's Licensing Agreement was not transferred in the asset purchase; and that that "the new company" was producing and shipping Mortal Kombucha as a "courtesy" to Ms. Rebecca Schepps.

149.    On March 14, 2025 Stop & Shop confirmed slotting for four Mortal Kombucha drinks in more than 350 stores as a result of MJM efforts and goodwill. Mr. Matthew Miottel connected the Stop & Shop buyer with Ms. Rebeccas Schepps and Defendant Shane Dickman as he had already tendered his resignation to Defendant HCK. Ms. Rebecca Schepps forwarded the confirmation with Stop & Shop to Defendant Marcus Gordon requesting communication on the matter, however, neither Defendant

Shane Dickman nor Defendant Marcus Gordon responded to Ms. Rebecca Schepps request to discuss MV's Stop & Shop slotting.

150.    On March 17, 2025 Defendant Shane Dickman forwarded the Press Release to Mr. Matthew Miottel, and stated all future cashflow to Defendant HCK would be used for IRS liabilities (and not in payment of amounts owed to MJM, MV or presumably any other creditor), and admitted that prior to the acquisition by Defendant HTL, Defendant HCK did not "properly service vendors" for Mortal Kombucha. Defendant Shane Dickman also wrote that the "new company" intended to continue producing Mortal Kombucha over the next year.

151.    On March 17, 2025 Defendant ICK posted on its Instagram account, run by Defendant Samantha Haertle, that it would be producing kombucha in resealable aluminum bottles for sale in connection with the national fitness chain; Life time Fitness.

152.    Under information and belief Defendant Samantha Haertle and Defendant Marcus Gordon were soliciting business for Defendant ICK and Defendant Better Beverages in connection with MV's Capper, and using MV''s Capper to produce Island City Kombucha; while at the same time Defendant Marcus Gordon, Defendant Shane Dickman, and Defendant Davd Haertle omitted such facts in negotiations with Ms. Rebecca Schepps regarding the new licensing agreement and unpaid royalty payments.

153.    On March 20, 2025 Defendant David Haertle, Defendant Shane Dickman, and Defendant Marcus Gordon conducted a telephone conference call with Ms. Rebecca Schepps in attempts to coerce her into signing a new licensing agreement with the "new company". In that call, Ms. Rebecca Schepps again raised the issue of unresolved royalites spanning back to August 2023, and in response Defendant David

Haertle claimed that under the asset purchase of HKC, the "new company" did not assume responsibility for any of Defendant HCK's outstanding and significant debt.

154.    Under information and belief, on or around March 21, 2025, Defendants informed Ms. Rebecca Schepps that Defendants were no longer interested in producing Mortal Kombucha, indicating their intent to terminate the Licensing Agreement and also that they did not plan on entering into a new licensing agreement with MV with the "new company".

155.    On March 21, 2025 Mr. Matthew Miottel forwarded Defendant David Haertle's and Defendant Shane Dickman's response, including the Press Release, to Ms. Rebecca Schepps, confirming the merger of Defendant HCK with the "new company" and effectuating the first written notice to MV that Defendant HCK had been acquired and that the Licensing Agreement was constructively terminated.

156.    During a March 27, 2025 phone call, Defendant Marcus Gordon told Mr. Matthew Miottel that Defendant Shane Dickman and Steve Dickman had received ownership in the "new company" in exchange for acquiring Defendant HCK.

157.    Under information and belief, the "new company" is a mere continuation of Defendant HCK, under the name Better Beverages, LLC aka Better Beverage Group, LLC. Defendants merely re-named Defendant HCK's LinkedIn, and, according to Defendant Better Beverage's webpage have retained substantially all of the managerial employees from HCK, with the addition of the adult Haertle children:  Defendant Samantha Haertle, Defendant Joseph Haertle, and Defendant Jaime Haertle.

158.    Under information and belief, Defendant David Haertle, Defendant Shane Dickman, and Steve Dickman, the owners of Better Beverages, are the same owners as

Defendant HCK, the merger of the companies being executed via equity transfer, with

Defendant David Haertle continuing in his role as director.

159. Under information and belief, Defendants have represented to creditors

that the "new company", Better Beverages, was created as the result of an asset

purchase by Defendant HTL Investments in attempt to distance Defendant David

Haertle  as a major shareholder and acting as director of both Defendant HCK and

Defendant Better Beverages.  In fact, the Defendants' own Press Release makes clear

this was an acquisition and not an asset purchase.

160. Undersigned counsel could find no registration of an entity related to

Better Beverages or Better Beverage Group in the State of Colorado, Texas, Delaware,

or Wisconsin, therefore, under information and belief Defendant David Haertle,

Defendant Samantha Haertle, Defendant Joseph Haertle, Defendant HTL, Defendant

Shane Dickman, and Defendant ICK are executing some portion of Defendant HCKs

contracts and production via a general partnership.

161. Under information and belief, at least several months after Defendant

David Haertle became aware of the debts and liabilities of Defendant HCK in his role as

director, Defendants created the alias of 'Better Beverages LLC' in attempt to

fraudulently avoid successor liability from creditors and also in a separate misguided

attempt to shield themselves from unrelated, ongoing financial fraud.

162. Under information and belief Defendant Marcus Gordon and Defendant

Shane Dickman solicited Stop & Shop to carry Defendant ICK's kombucha line, thereby

usurping the contract secured by MJM on behalf of MV, and thereby denying royalties

owed to MV and commission owed to MJM and likewise intentionally interfering with MV's business.

163.    Under information and belief, utilizing the contacts and information garnered from MV and MJM, Defendant Marcus Gordon and Defendant Shane Dickman solicited Sprouts to slot Juneshine, Inc., kombucha in the slots MV lost as a direct result of the Defendants failing to produce and ship Mortal Kombucha in a timely manner, thereby personally benefitting Defendant Marcus Gordon from commission in his role as a sales broker on behalf of Juneshine, Inc and also benefitting Defendants joint enterprise which operates as a co-packer for Juneshine, Inc.'s kombucha.

164.    Under Information and belief, Defendants began producing, and continue to the date of filing this complaint, Defendant ICK's kombucha utilizing MV's Capper as at as early as December 2024.

165.    Under information and belief, Defendants began producing, and continue to the date of filing this complaint, Defendant ICK's kombucha utilizing MV's trade secrets and in some cases using MV's capper, as early as December 2024.

166.    Under information belief, Defendants fabricated fraudulent nutrition labels, ingredient lists, organic certifications, and descriptions of origin on Defendant ICK's Island City Kombucha labels. Specifically, Defendant ICK's kombucha is manufactured at the Bottling Plant, but lists a non-existent Wisconsin entity ("Island City Kombucha") based in Wisconsin, as the producer.

## DEFENDANT BETTER BEVERAGES INFRINGES MV'S COPYRIGHTS AND TRADEMARKS.

167.    Under information and belief Defendants, via Defendant Better Beverages, produced, and shipped nationally, Mortal Kombucha bearing MV's trademarks and

copyrights, between at least February 2025 and at least as late May 2025, well after the Licensing Agreement had been terminated and MV had been informed that Better Beverages did not wish to continue producing Mortal Kombucha.

168.    Specifically, sometime between March 10, 2025 and March 27, 2025 Defendants made written representations to Distributors in connection with modifying remittance addresses so as to receive money from unauthorized distribution of Mortal Kombucha.

169.    On February 13, 2025 and March 10, 2025 Defendant HCK received payments from Solis Distribution stemming from orders of Mortal Kombucha made from January 26 through February 22, 2025.

170.    On February 26, 2025 Defendant HCK received a PO for Mortal Kombucha products from Solis Distribution (hereinafter "PO 9123").

171.    On or about March 14, 2025 Defendants began to fill PO 9123 by shipping Mortal Kombucha products despite that fact that Defendant David Haertle had already acknowledged in a March 13, 2023 email that Defendant Better Beverages was not operating under the Licensing Agreement.

172.    In connection with changing the remittance address, Defendants directed Distributors to change the remittance address from Defendant HCK's to: "Better Beverages, LLC PO Box 180511 Delafield, WI 53018", the same address listed as the principal office for Defendant HTL, and Defendant ICK.

173.    MV is the owner of wordmark MORTAL KOMBUCHA (Registration No. 5,427,475, hereinafter the " '475 Mark") and the wordmark MORTAL (Registration No. 7,470,756, hereinafter the " '756 Mark").

174.    Upon information and belief, Defendants, via Defendant Better Beverages, have marketed and sold Mortal Kombucha bearing the '475 Mark and the '756 Mark to MV's Retail Vendors and Distributors, nationally. Defendants have continued to manufacture and distribute Mortal Kombucha to MV's Retail Vendors and Distributors taking advantage of MV's nationally recognized trademarks, consumer reputation and goodwill.

175.    In preparation for legal action MV filed a copyright on the label for Strawberry Basil, which it has published since at least 2020, on June 6, 2025, under registration number VA0002448430.

176.    Defendant ICK and Defendant Better Beverages worked in concert to copy artistic elements, as well as written copy, directly from MV's labels and reproduce said elements and copy for labels on Island City Kombucha bottles, for subsequent printing and national distribution.

177.    Under information and belief Defendant Samantha Haertle replicated MV's copyrights in the Mortal Kombucha labels and written copy therein on substantially all of Defendant ICK's kombucha line in order to misappropriate MV's goodwill and brand recognition.

178.    Specifically, Defendant Smantha Haertle copied the following elements from VA0002448430, the Strawberry Basil label:

Element A: the phrase "Good Stuff" with an arrow pointing to product label indicators of vegan, organic, non-GMO, *inter alia*, which is present on all of Defendant ICK's labels.

Element B: the phrase "Beep" with an arrow pointing to the labels UPC barcode, which is present on all of Defendant ICK's labels.

Element C: the phrase: "It's real fruit. Real good. Real probiotics." is copyrighted under VA0002448430, and the phrase "It's real fruit, real goodness, and an abundance of probiotics…" is present on all of Defendant ICK's strawberry basil kombucha labels. Ironically, Defendant ICK's strawberry basil kombucha label only lists strawberry concentrate as an ingredient, and unlike MV's Strawberry Basil label, Defendant ICK's label does not list fruit puree (i.e, "real fruit") as an ingredient.

## DEFENDANTS REFUSED TO RETURN MV'S CAPPER AND HAVE MISAPPROPRIATED MV'S INTELLECTUAL PROPERTY

179.    On or around March 26, 2025 Defendant Shane Dickman responded to Ms. Rebecca Schepps' demand for the Defendants to return MV's Capper stating he did not have authority to transfer or decommission MV's Capper, and such acts would require approval by the Wisconsin Defendants.

180.    On or around March 27, 2025 Defendant Marcus Gordon told Mr. Matthew Miottel via phone that because MV's Capper was owned by MV and not Defendant HCK, that Defendant Samanatha Haertle was particularly frustrated by this fact because of her expectation to bottle Defendant ICK's kombucha using MV's Capper.

181.    On April 1 and April 9, 2025 MV and MJM delivered notice to Defendants demanding payment of royalties, commission, and return of MVs Capper to MV's custody, and recognition that the Defendants were not good faith holders of MV's Capper.

182.    On April 7, 2025 Defendant ICK posted on its Instagram account a video showing Defendant ICK's bottling of its kombucha, using MV's Capper and, under information and belief bottling MV's proprietary Strawberry Basil recipe.

183.    Under information and belief, Defendants have misappropriated MV's trade secrets in order to gain economic advantage for Defendant HTL and Defendant ICK, and Defendant Better Beverages, such trade secrets include, but are not limited to: business methods regarding branding, marketing, and target Retail Vendors; financial know-how related to the aluminum bottles, the physical and chemical characteristics of compounds of MV's successful Mortal Kombucha flavors; manufacturing processes and operations stemming from MV's unique Capper*;* MV's financial and analytical methodology; MV's financial, sales, and customer data; MV's future market and product plans; and have refused to return MV's capper, and are illicitly using MV's capper for economic gain.

### COUNT I - Violations of the Racketeer Influenced and Corrupt Organizations Act Against Defendants HTL, HCK, ICK, David Haertle, Samantha Haertle, Joseph Haertle, Shane Dickman, and Marcus Gordon
(18 U.S.C. §§ 1961, *et seq*.)

184.    MV repeats and incorporate by reference the allegations set forth in Paragraphs 1 through 183 above.

185.    At all relevant times, MV was a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c), because MV was "capable of holding a legal or beneficial interest in property" and "were injured in their business or property by a violation of 18 U.S.C. § 1962."

186.    At all relevant times, each Defendant was a "person" within the meaning of

18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or

beneficial interest in property."

187.    The enterprise, as that term is defined in 18 U.S.C. § 1961(4), consists of

Defendant HTL, Defendant ICK, and Defendant HCK, in association with all the

individual named Defendants. The enterprise engaged in and affected interstate

commerce.

188.    From at least 2024, through the present time, the enterprise joined

together for a common purpose of converting and misappropriating MV's valuable trade

secrets other proprietary information, and MV's business contracts and relationships

through a series of acts, including but not limited to: fraudulently misleading Ms.

Rebecca Schepps, Mr. Matthew Miottel, and other third parties; reproducing and

sharing MV's trade secrets and passing such information off as their own, intentionally

delaying Mortal Kombucha production, forming a new business entity 'Better

Beverages" in the form of a general partnership to utilize said stolen trade secrets and

proprietary information; and engaging in other improper conduct such as conducting a

fraudulent asset acquisition in order to mislead MV and other creditors so that

Defendants could thwart MV, MJM and other creditors legal rights by attempting to

avoid successor liability.

189.    Said common purpose is shown by the actions of Defendant Shane

Dickman set forth above in Paragraphs 116 through 119, 137, 139, 153, 157 through

159, 161 through 168,  171 through 172, 174, 176, 179, and 183 ; the actions of

Defendant Marcus Gordon set forth above in Paragraphs 118 through 119, 123 through

125, 128 through 130, 141 152, 153, 157 through 159, 161 through 168,  171 through

172, 174, 176, and 183; the actions of Defendant David Haertle set forth above in

Paragraphs 122, 125, 138, 148, 153, 157 through 159, 161 through 168, 171 through

172, 174, 176, 179, and 183; the actions of Defendant Joseph Haertle as set forth

above in Paragraphs 159, 161 through 168, 171 through 172, 179 and 183; the actions

of Defendant Samantha Haertle set forth above in Paragraphs 152, 159, 161 through

168, 171 through 172, 176 through 179 and 183 the Actions of Defendant Jamie Haertle

as set forth above in Paragraphs 159, 161 through 168, 171 through 172, 179 and 183;

All of these individual Defendants coordinated their efforts to form 'Better Beverages' in

furtherance of their scheme.

190.    In violation of the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C.§ § 1962(a) and (b), all Defendants have received and continue to

receive income derived from a pattern of racketeering activity and used or invested such

income in the establishment, operation, and maintenance of an enterprise engaged in,

or the activities of which affect, interstate commerce.

191.    In violation of RICO, 18 U.S.C.§ 1962(c), all Defendants have been

employed by or associated with an enterprise engaged in, or the activities of which

affect, interstate commerce, to conduct or participate in the conduct of such enterprises'

affairs through a pattern of racketeering activity.

192.    The racketeering activity, as that term is defined in 18 U.S.C. § 1961(1),

referred to above includes, but is not limited to the following predicate offenses:

        a.  Engaging in theft of trade secrets proscribed by 18 U.S.C. § 1832, by

            way of example and at least comprising: (i) using MV's recipes for

private label business for HEB kombucha and Defendant ICK

kombucha, and (ii) using MV's Capper for producing Defendant ICK's

kombucha, (iii) and using MV's confidential financial data and financial

models, marketing plans, know-how, customer lists, and business

plans to further the enterprise.

b.  Engaging in wire fraud proscribed by 18 U.S.C. § 1343, by way of

example and at least comprising: (i) sending by fraudulent email

invoices and/or communications regarding orders related to MV's

Mortal Kombucha line and amounts owed by MV in connection with

false documents stating production and/or delivery of Mortal

Kombucha (ii) making material misrepresentations via email about

actions undertaken, or to be undertaken by Defendants in attempts to

induce financial hardship on MV for Defendants benefit in negotiations,

(iii) transmitting emails to MV's Retail Vendors and Distributors,

including falsehoods and material misrepresentations about contracts

thereto in order to to steal for themselves, Defendant Better

Beverages, and their enterprise said contracts and POs; and (iv)

transmitting offers and/or communications associated with such bids

by email for, *inter alia,* HEB private label products, Defendant ICK

Kombucha production and sales to Life time Fitness and Stop & Shop,

using and including stolen MV trade secrets, by falsely representing

that such proprietary information was owned by Defendant Better

Beverages;

      c.  <u>Engaging in monetary transactions in property derived from specified</u>

<u>unlawful activity, in violation of 18 U.S.C. § 1957</u>, by way of illustration

and without limitation by: (i) converting to their own use without

authority, conveying a thing of value being made under contract,

and/or receiving same with the intent to convert it to their own gain in

violation of 18 U.S.C. § 641, thereby engaging in "specified unlawful

activity" within the meaning of 18 U.S.C. § 1956(7)(D), and violating 18

U.S.C. § 1956(a)(3)(A) to pay bills and purchase ingredients, using

MV's royalties remitted to Defendant Better Beverages, hide assets

from lawful creditors by use of a network of foreign LLC's and

unregistered partnerships.

      193.   Defendants have engaged in a pattern of racketeering activity, as defined

by 18 U.S.C. § 1961(5), as identified in the preceding paragraph. Defendants

racketeering activities have continuity inasmuch as they occurred over a prolonged

period of time (2024 through present), and are continuing as a regular part of

Defendants' business practice. Specifically, Defendants and the enterprise continue to

use trade secrets stolen from MV in Defendant Better Beverages bids and other

proposals to customers and potential customers, falsely representing to said persons

that Defendant Better Beverages owns MV's trade secrets.

      194.   The Defendants' acts of racketeering activity are related, as they share a

common purpose, participants, victim, and result, and method of commission, and are

not isolated events.

195.    As a direct and proximate cause of the Defendants' actions, MV has been injured, and continues to be injured, in its business or property by reason of the violations of 18 U.S.C. § 1962.

196.    By reason of these RICO violations, MV is entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

## COUNT II – Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act Against All Defendants

(U.S.C. §§ 1349 and 1962(d))

197.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 196 above.

198.    All individual Defendants conspired with each other and with Defendant Better Beverages to establish, operate, and maintain an enterprise, as defined by 18 U.S.C. § 1961(4), to engage in a pattern of racketeering activities, as defined by 18 U.S.C. § 1961(1) and (5), the activities of which affect interstate commerce, as further set forth in Count I, in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1962(d).

199.    All individual Defendants conspired to make materially false representations to MV throughout the summer of 2024 and cause financial hardship to MV thereby inducing MV to enter into a new licensing agreement.

200.    All individual Defendants conspired with each other and with Better Beverages to steal MV's trade secrets, and use the same to steal business opportunities that otherwise would have gone to MV, as further set forth in Count I, in violation of 18 U.S.C. §1349 and 18 U.S.C. §1962(d).

201.    Each of the co-conspirators have conspired and agreed that members of the enterprise would commit the numerous predicate acts of racketeering in furtherance of the conspiracy described in Count I.

202.    The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the affairs of the enterprise previously alleged through a pattern of racketeering activity.

203.    As a direct and proximate cause of the Defendants' actions, MV has been injured, and continues to be injured, in its business or property by reason of the violations of 18 U.S.C. § 1962.

204.    By reason of these RICO violations, MV is entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

## COUNT III - Violation of COCCA Against Defendants HTL, HCK, ICK, David Haertle, Samantha Haertle, Joseph Haertle, Shane Dickman, and Marcus Gordon
(Colo. Rev. Stat. §§ 18-17-101 *et seq.*)

205.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 204 above.

206.    This is a claim by MV against Defendants HTL, HCK, ICK, David Haertle, Samantha Haertle, Jamie Haertle, Joseph Haertle, Shane Dickman, and Marcus Gordon for violation of Colo. Rev. Stat. §§ 18-17-101 et seq., the Colorado Organized Crime Control Act ("COCCA"), and specifically Colo. Rev. Stat. §§ 18-17-104(1)(a), (2), and (3).

207.    Each of the Defendants is a "person" within the meaning of Colo. Rev. Stat. §18-17-103(4).

208.    The Defendants, acting together constitute an association-in-fact "enterprise" within the meaning of Colo. Rev. Stat. § 18-17-103(2) with the common purpose to defraud MV and misappropriate MV's trade secrets and confidential information. Alternatively, Better Beverages constitutes an "enterprise" within the meaning of Colo. Rev. Stat. § 18-17-103(2), which the other Defendants conducted, controlled, invested and participated in.

209.    Defendants have engaged in a "pattern of racketeering activity" within the meaning of Colo. Rev. Stat. § 18-17-103(3) since sometime in 2024 through and including the present, including two or more acts of racketeering activity.

210.    The racketeering activity, as the term is defined in Colo. Rev. Stat. § 18-17-103, includes, but is not limited to, the following predicate offenses:

a.    Engaging in theft of trade secrets proscribed by 18 U.S.C. § 1832, by way of example and at least comprising: (i) using MV's recipes for private label business for HEB kombucha and Defendant ICK kombucha, (ii) using MV's Capper for producing Defendant ICK's kombucha, (iii) and using MV's confidential financial data and financial models, marketing plans, know-how, customer lists, and business plans to further the enterprise.

b.    Engaging in wire fraud proscribed by 18 U.S.C. § 1343, by way of example and at least comprising: (i) sending by fraudulent email invoices and/or communications regarding orders related to MV's Mortal Kombucha line and amounts owed by MV in connection with false documents stating production and/or delivery of Mortal

Kombucha (ii) making material misrepresentations via email about actions undertaken, or to be undertaken by Defendants in attempts to induce financial hardship on MV for Defendants benefit in negotiations, (iii) transmitting emails to MV's Retail Vendors and Distributors, including falsehoods and material misrepresentations about contracts thereto in order to steal for themselves, Defendant Better Beverages, and their enterprise said contracts and POs; and (iv) transmitting offers and/or communications associated with such bids by email for, *inter alia,* HEB private label products, Defendant ICK Kombucha production and sales to Life time Fitness and Stop & Shop, using and including stolen MV trade secrets, by falsely representing that such proprietary information was owned by Defendant Better Beverages;

c.  Engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, by way of illustration and without limitation by: (i) converting to their own use without authority, conveying a thing of value being made under contract, and/or receiving same with the intent to convert it to their own gain in violation of 18 U.S.C. § 641, thereby engaging in "specified unlawful activity" within the meaning of 18 U.S.C. § 1956(7)(D), and violating 18 U.S.C. § 1956(a)(3)(A) to pay bills and purchase ingredients, using MV's royalties remitted to Defendant Better Beverages, hide assets from lawful creditors by use of a network of foreign LLC's and unregistered partnerships.

211.    The Defendants' acts of racketeering activity are related, as they share a common purpose, participants, victim, and result, and method of commission, and are not isolated events.

212.    At least one of these racketeering activities occurred in Colorado after July 1, 1981, and the last of these racketeering activities occurred within ten years after a prior act of racketeering activity.

213.    The racketeering activities have continuity inasmuch as they occurred over a prolonged period of time, and are continuing as a regular part of Defendants' business practice. Defendants and the enterprise continue to use trade secrets stolen from MV, and continue to falsely represent that Defendant Better Beverages owns MV's trade secrets.

214.    In violation of Colo. Rev. Stat. § 18-17-104(1)(a), Defendants received proceeds as a result of their pattern of racketeering activity, and invested those proceeds in the operation of the enterprise.

215.    In violation of Colo. Rev. Stat. § 18-17-104(2), Defendants, through their pattern of racketeering activity, knowingly acquired and/or maintained an interest in and control of the enterprise.

216.    In violation of Colo. Rev. Stat. § 18-17-104(3), Defendants are associated with an enterprise, and conduct and/or participate in the enterprise through the above alleged pattern of racketeering activity.

217.    Defendants' actions were not intended coordinate and use good faith efforts to continue licensing and producing Mortal Kombucha under the Licensing Agreement with MV. Rather, Defendants' pattern of racketeering activity was intended

and designed by Defendants to be used for their own profit and to the detriment of MV, because the delays that caused MV to lose slots at its retailers yielded opportunity for the Defendants and their enterprise, and MV will continue to be injured in its business and property caused by Defendants' activities alleged herein unless enjoined by this Court.

218.    As a result of the successful execution of the Defendants' scheme, Defendant Better Beverages claims to control, and appears to the relevant industry customers to own, bottling equipment and trade secrets rightfully owned by MV and stolen by Defendants from MV.

219.    As a result of the foregoing, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

220.    Pursuant to Colo. Rev. Stat. § 18-17-106(7), MV is entitled to treble damages, reasonable attorneys' fees, and the costs of this action.

221.    Pursuant to Col. Rev. Stat § 18-17-106(1)(a), MV is entitled to an order requiring the individual Defendants to divest themselves of any interest in Defendant Better Beverages, including real and/or personal property.

222.    Pursuant to Colo. Rev. Stat. § 18-17-106(1)(c) and (e), MV is entitled to an order dissolving Defendant Better Beverages and requiring the forfeiture of the charter of its incorporation, or alternatively, whichever entity that controls the cash accounts of the enterprise.

223.    Unless the Defendants are enjoined by this Court from continuing these aforementioned actions, MV suffers, and will continue to suffer, immediate, substantial, and irreparable injury, for which there is no adequate remedy at law.

## COUNT IV - Conspiracy to Violate COCCA Against all Defendants
(Colo. Rev. Stat. §18-17-104(4))

224.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 223 above.

225.    This is a claim by MV against all Defendants for violations of COCCA, and specifically Colo. Rev. Stat. §18-17-104(4).

226.    Each of the Defendants is a "person" within the meaning of Colo. Rev. Stat. §18- 17-103(4).

227.    In violation of Colo. Rev. Stat. § 18-17-104(4), all of the Defendants conspired and endeavored to violate the provisions of Colo. Rev. Stat. § 18-17-104(1), (2), and (3). Defendants conspired with the common purpose of misappropriating MV trade secrets and proprietary equipment and using those to retain business opportunities through Defendants intentional acts caused MV to lose, and agreed that members of the conspiracy would commit two or more acts of racketeering activity.

228.    The conspiracy was furthered by unlawful, overt acts of racketeering activity intentionally performed by the conspirators, including but not limited to wire fraud, and theft of both trade secrets and physical property as set forth above.

229.    As a result of the foregoing, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

230.     Pursuant to Colo. Rev. Stat. §18-17-106(7), MV is entitled to treble damages, reasonable attorneys' fees, and the costs of this action.

231.    Pursuant to Col. Rev. Stat § 18-17-106(1)(a), MV is entitled to an order requiring the individual Defendants to divest themselves of any interest in Defendant Better Beverages, including real and/or personal property.

232.    Pursuant to Colo. Rev. Stat. § 18-17-106(1)(c) and (e), MV is entitled to an

order dissolving Defendant Better Beverages and requiring the forfeiture of the charter

of its incorporation, or alternatively, whichever entity that controls the cash accounts of

the enterprise.

233.    Unless the Defendants are enjoined by this Court from continuing these

aforementioned actions, MV suffers, and will continue to suffer, immediate, substantial,

and irreparable injury, for which there is no adequate remedy at law.

### COUNT V - Trade Secret Misappropriation Pursuant to the Colorado Uniform Trade Secrets Act Against All Defendants

234.    MV repeats and incorporates by reference the allegations set forth in

Paragraphs 1 through 233 above.

235.    Each of the Defendants had a duty to maintain the secrecy of or limit the

use of MV's trade secrets. Each of the Defendants knew or had reason to know of this

duty.

236.    Each Defendant disclosed MV trade secrets to Defendant Better

Beverages and/or to some other third person, and/or used MV trade secrets.

237.    Said disclosure or use by Defendants was without MV's consent, express

or implied.

238.    At the time of said disclosure or use, each Defendant knew or had reason

to know that his, her, or its knowledge of said trade secrets was acquired under

circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

239.    Defendants' acts identified herein, as well as other acts yet to be

discovered, constitute misappropriation of trade secrets under Colo. Rev. Stat. § 7-74-

101, *et seq*.

240.    As a result of Defendants' unauthorized disclosure or use of MV's trade secrets, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

241.    Defendants' misappropriation of MV's trade secrets was done in willful and wanton disregard of MV's proprietary rights.

242.    MV is entitled to its reasonable attorneys' fees and the costs of this action.

243.    Each Defendant has misappropriated MV's trade secrets for his or her own benefit and will continue to do so unless enjoined by this Court.

244.    Unless each Defendant is restrained by this Court from continuing to misappropriate MV's trade secrets, MV suffers and continues to suffer, immediate, substantial, and irreparable injury, for which there is no adequate remedy at law.

### COUNT VI – Breach of Contract Against Defendant HCK
(Licensing Agreement)

245.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 244 above.

246.    Defendant Shane Dickman duly executed the Licensing Agreement on behalf of Defendant HCK.

247.    Defendant Better Beverages is the result of a merger between Defendant HCK and Defendant Better Beverages.

248.    Defendant Better Beverages is a mere continuation of Defendant HCK due to the facts that Defendant David Haertle, Defendant Shane Dickman, and Steve Dickman remain as owners and Defendant David Haertle as director.

249.    Defendant Better Beverages was formed in part, as a means to avoid creditors and legal liabilties stemming from acts undertaken by Defendant HCK while Defendant David Haertle was a major shareholder and director of Defendant HCK.

250.    Therefore, Defendant Better Beverages meets at least one of the exceptions for successor liability, and is liable for debts and contractual liabilities of Defendant HCK.

251.    MV has at all times performed its duties under the Licensing Agreement by granting an exclusive, non-assignable, non-transferrable, royalty bearing license of MV's intellectual property, including MV's trade secrets.

252.    Defendant HCK has breached the Licensing Agreement through its improper use or disclosure of trade secrets and other proprietary and confidential information to Defendant Better Beverages, and its participation in the enterprise.

253.    Defendant HCK has breached the Licensing Agreement though its failure to pay royalties to MV.

254.    Defendant HCK has breached the Licensing Agreement through its failure to execute an audit in connection with royalties still owed by Defendant HCK to MV.

255.    Defendant HCK has breached the Licensing Agreement though its failure to notify MV of material financial issues affecting MV's business contracts and relationships.

256.    Defendant HCK has breached the Licensing Agreement though its failure to notify MV of the transfer of materially all of Defendant HCK's assets to Defendant Better Beverages.

257.    As a result of Defendant HCK's breach of contract, MV has been

damaged, and will continue to be damaged, in an amount to be proven at trial.

### COUNT VII – Breach of Contract Against Defendant HTL
(Non-Disclosure Agreement)

258.    MV repeats and incorporates by reference the allegations set forth in

Paragraphs 1 through 257 above.

259.    Defendant David Haertle duly executed the Non-Disclosure Agreement on

behalf of Defendant HTL.

260.    MV has at all times performed its duties under the Non-Disclosure

Agreement by sharing confidential information and likewise keeping confidential

information disclosed to MV pursuant to the Non-Disclosure Agreement.

261.    Defendant HTL has breached the Non-Disclosure Agreement by its

improper use or disclosure of MV trade secrets and propriety information to Defendant

and/or Defendant Better Beverages, through participation in the enterprise, including but

not limited to: misappropriation of financial and business secrets related to the use of

MV's Capper and use of aluminum bottles for kombucha.

262.    As a result of Defendants HTL's breach of contract, MV has been

damaged, and will continue to be damaged, in an amount to be proven at trial.

### COUNT VIII – Conversion Against All Defendants

263.    MV repeats and incorporates by reference the allegations set forth in

Paragraphs 1 though 262.

264.    MV has ownership and right of immediate possession to MV's property,

including MV's Capper.

265.    Defendants have exercised dominion and/or ownership over said property though their actions described above, in addition to other acts yet to be discovered, and have possession of MV's Capper.

266.    Defendants exercise of dominion and control over MV' Capper is wrongful.

267.    MV did not authorize Defendants' actions.

268.    Defendants have intentionally frustrated MV's attempts to repossess MV's property.

269.    To date, Defendants have filed to return said property to MV.

270.    As a result of the Defendants' conversion of MV property, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

271.    MV is entitled to return of all property in the possession of Defendants or other third parties.

## COUNT IX – Replevin Against All Defendants

272.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 though 271 above.

273.    MV is the owner of and entitled to possession of certain physical property described herein, including but not limited to MV's Capper.

274.    MV's physical property is being detained by the Defendants against MV's claim of right to possession.

275.    Upon information and belief MV's physical property is located in Gypsum, Colorado under control by Defendant's at the Bottling Plant.

276.    Defendants obtained and possessed MV's property by means described throughout this Complaint, as set forth above, among others yet to be discovered.

277.    MV's property is of an approximate value of $50,000.00

278.    MV's property has not been taken for a tax assessment or fine pursuant to
a statute, or seized under an execution of the property of MV.

279.    MV has continued to service debt in connection with MV's Capper.

280.    As a result of the foregoing, MV has been damaged, and will continue to
be damaged, in an amount to be proven at trial.

281.    As a result of the foregoing, MV is entitled to return of MV's physical
property, trade secrets, and money, among other property.

### COUNT X –Civil Theft Against all Defendants
(Colo. Rev. Stat. § 18-4-405)

282.    MV repeats and incorporates by reference the allegations set forth in
Paragraphs 1 through 281 above.

283.     In perpetrating the schemes alleged in this complaint, the Defendants
committed theft in violation of Colo. Rev. Stat. § 18-4-401.

284.    Defendants obtained the physical property of MV without MV's
authorization.

285.    Defendants obtained the physical property of MV with the intent to
permanently deprive MV of its use or benefit, and did knowingly use the physical
property in such a manner as to deprive MV permanently of their use or benefit.

286.    As a result of the theft by Defendants, MV has been damaged, and will
continue to be damaged, in an amount to be proven at trial.

287.    Pursuant to Colo. Rev. Stat. § 18-4-405, MV is entitled to recover
damages of three times the amount of actual damages sustained by it as well as
reasonable attorneys' fees incurred in obtaining this relief.

**COUNT XII –Breach of Contract Against Defendant HCK and Defendant Better
Beverages**
(Broker Agreement)

288.    MJM incorporates by reference the allegations set forth in Paragraphs 1
through 287 above.

289.    Defendant Shane Dickman duly executed the Broker Agreement on behalf
of Defendant HCK.

290.    Defendant Better Beverages is the result of an acquisition or merger
between Defendant HCK and Defendant Better Beverages.

291.    Because Defendant David Haertle, Defendant Shane Dickman, and Steve
Dickman remain as owners of Defendant Better Beverages, and Defendant David
Haertle as director, Defendant Better Beverages is a mere continuation of Defendant
HCK

292.    Defendant Better Beverages was formed in part, as a means to avoid
creditors and legal liabilities stemming from acts undertaken by Defendant HCK while
Defendant David Haertle was a major shareholder and director of Defendant HCK.

293.    Therefore, Defendant Better Beverages meets at least one of the
exceptions for successor liability, and is liable for debts and contractual liabilities of
Defendant HCK.

294.    MJM has at all times performed its duties under Broker Agreement by
acting as a sales broker agent on behalf of Defendant HCK to solicit sales of Mortal
Kombucha.

295.    Defendant HCK has breached the Broker Agreement by its failure to timely pay MJM all owed commissions, retainers and contractual fees pursuant to the Broker Agreement.

296.    As a result of Defendants HCK's breach of contract, MJM has been damaged, and will continue to be damaged, in an amount to be proven at trial.

### COUNT XIII –Breach of the Duty of Good Faith and Fair Dealing Against Defendants HCK, Shane Dickman, Marcus Gordon, and David Haertle

297.    MJM and MV repeat and incorporate by reference the allegations as set forth in Paragraphs 1 through 296 above.

298.    Defendant HCK owed a duty of good faith and fair dealing to MV due to the contractual nature of Defendant HCK and MV's relationship wherein Defendant HCK was licensing MV intellectual property, inclusive of MV's goodwill and public brand identity.

299.    Defendant Shane Dickman, Defendant Marcus Gordon, and Defendant David Haertle were managers and/or directors of Defendant HCK with the power to contractually bind Defendnant HCK, and thereby individually also owed MV a duty of good faith and fair dealing, in their actions and representations to MV as managers of Defendant HCK.

300.    Defendant HCK owed a duty of good faith and fair dealing to MJM due to the contractual nature of Defendant HCK and MJM's relationship wherein Defendant HCK contracted MJM to broker transactions relying upon MJM's goodwill as a renowned sales representative in consumer packaged goods.

301.    Defendant Shane Dickman, Defendant Marcus and Defendant David Haertle were managers and/or directors of Defendant HCK and who directed the

actions of MJM as a subcontractor, and thereby individually also owed MJM a duty of good faith and fair dealing.

302.    Defendant HCK, Defendant Shane Dickman, Defendant Marcus Gordon, and Defendant David Haertle breached their duty of good faith and fair dealing to MV by, in addition to acts yet discovered: material omissions and misrepresentations regarding royalties owed to MV; disclosure, or communication of MV's trade secrets, confidential and proprietary information, and property to Defendant Better Beverages and its employees, representatives, consultants, and agents, without prior consent of MV, and Defendant HCK, Defendant Shane Dickman, Defendant Marcus Gordon, and Defendant David Haertle's misuse of such information and property without prior consent of MV.

303.    Defendant HCK, Defendant Shane Dickman, Defendant Marcus Gordon Defendant David Haertle breached their duty of good faith and fair dealing to MJM by, in addition to acts yet discovered: material omissions and misrepresentations to MJM in connection with commissions and payment owed under the Broker Agreement.

304.    As a result of the foregoing, MV and MJM have been damaged, and will continue to be damaged, in amounts to be determined at trial.

### COUNT XIV – Violations of Lanham Act Against All Defendants
(15 U.S.C. § 1114(1))

305.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 304 above.

306.    Defendants have worked in conjunction to further the common enterprise of Defendant Better Beverages.

307.    Defendant Better Beverages has advertised, produced and subsequently delivered kombucha bearing with labels bearing the '475 Mark and the '756 Mark to MV's Retail Vendors and Distributors, nationally, without a license to distribute said marks.

308.    Defendant Better Beverages deceived MV's Retail Vendors and Distributors and has caused confusion of the same by continued sale of kombucha with labels bearing the '475 Mark and the '756 Mark being sold in retail stores to the general public.

309.    Accordingly, MV is entitled to monetary damages, pursuant to 15 U.S.C.§ 1114(1).

310.    As a result of the foregoing, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

311.    Additionally, pursuant to 15 U.S.C. §§ 1117(a) and (b), MV is entitled to recover three times its actual damages, plus recovery of Defendants' profits relating to infringement, plus the costs of this action, plus recovery of its attorneys' fees expended in this action, as Defendants' false representations, were willful and intentional.

312.    Alternatively, pursuant to 15 U.S.C. §§ 1117(c)(1) and (2) MV is entitled to recover statutory damages of not more than $2,000,000 per counterfeit mark per type of good, sold, offered for sale, or distributed.

### COUNT XV – Violations of Lanham Act Against All Defendants
(15 U.S.C. § 1125(a))

313.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 312 above.

314.    Defendants have worked in conjunction to further the common enterprise of Defendant Better Beverages.

315.    Defendants have falsely advertised ownership and control over MV's Capper, and MV's trade secrets in connection with Defendants previous relationship with MV, in pursuit of commercial relationships to Retail Vendors and Distributors, as well as white label production services for at least HEB and Defendant ICK utilizing MV's Capper.

316.    Defendants' false representations to at least Solis, Stop & Shop, HEB, and Defendant ICK caused MV's Capper and MV's trade secrets to be used in commerce thus harming MV.

317.    Accordingly, MV is entitled to monetary damages, pursuant to 15 U.S.C. §1125(a).

318.    As a result of the foregoing, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

319.    Additionally, pursuant to 15 U.S.C. § 1117 MV is entitled to recover three times its actual damages, plus recovery of Defendants' profits relating to unfair competition, plus the costs of this action, plus recovery of its attorneys' fees expended in this action, as Defendants' false representations, were willful and intentional.

## COUNT XVI – Violations of Lanham Act Against Defendant ICK
### (15 U.S.C. § 1125(a))

320.    MV repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 319 above.

321.    Defendants ICK has falsely advertised nutrition labels, ingredient lists, organic certifications, and descriptions of origin on Defendant ICK's Island City

Kombucha labels has induced consumers, retail vendors, and distributors to purchase

Defendant ICK's products in national commerce, in competition with MV, injuring MV.

322.    Accordingly, MV is entitled to monetary damages, pursuant to 15 U.S.C.

§1125(a).

323.    As a result of the foregoing, MV has been damaged, and will continue to

be damaged, in an amount to be proven at trial.

324.    Additionally, pursuant to 15 U.S.C. § 1117, MV is entitled to recover three

times its actual damages, plus recovery of Defendants' profits relating to unfair

competition, plus the costs of this action, plus recovery of its attorneys' fees expended

in this action, as Defendants' false representations, were willful and intentional.

### COUNT XVII – Copyright Infringement Against Defendant ICK
(17 U.S.C. § 501)

325.    MV repeats and incorporates by reference the allegations set forth in

Paragraphs 1 through 324 above.

326.    MV is the sole owner of all copyrights to Mortal Kombucha bottle labels

and written copy contained therein, including, at least, VA0002448430.

327.    Defendant ICK had access to MV's copyrights in connection with

Defendant Samantha Haertle and Defendant Joseph Haertle's roles as managers of

Defendant Better Beverages.

328.    Defendant ICK and Defendant Samantha replicated, in part, written copy

and design elements of VA0002448430 on at least 12 different labels of kombucha

corresponding to the Defendant ICKs entire product line.

329.    As a result of the foregoing, MV has been damaged, and will continue to

be damaged, in an amount to be proven at trial.

330.     Accordingly, MV is entitled to injunctive relief halting the sale and
distribution of all of Defendant ICK's kombucha line pursuant to 17 U.S.C. § 502(a).

331.     Additionally, pursuant to 17 U.S.C. §§ 504 and 505 MV is entitled to actual
damages and profits, or alternatively, statutory damages for willful infringement; plus,
the costs of this action, plus recovery of its attorneys' fees expended in this action, as
Defendant ICK's actions were willful and intentional.

### COUNT XVIII – Copyright Infringement Against Defendant Better Beverages
(17 U.S.C. § 501)

332.     MV repeats and incorporates by reference the allegations set forth in
Paragraphs 1 through 331 above.

333.     MV is the sole owner of all copyrights to Mortal Kombucha bottle labels
and written copy contained therein, including, at least, VA0002448430.

334.     Defendant Better Beverages had access to MV's copyrights in connection
with exercising dominion over substantially all of Defendant HCK's assets and the
Bottling Plant.

335.     Defendant Better Beverages has advertised, produced and subsequently
delivered kombucha with labels bearing VA0002448430, and copyrights therein on all of
MV's Mortal Kombucha line.

336.     Defendant Better Beverages, through its principals, had actual knowledge
of no right to reproduce or distribute MV's intellectual property, including copyrights.

337.     As a result of the foregoing, MV has been damaged, and will continue to
be damaged, in an amount to be proven at trial.

338.    Accordingly, MV is entitled to injunctive relief halting the sale and
distribution of all of Defendant Better Beverages products bearing MV's copyrights
pursuant to 17 U.S.C. § 502(a).

339.    Additionally, pursuant to 17 U.S.C. §§ 504 and 505 MV is entitled to actual
damages and profits, or alternatively, statutory damages for willful infringement; plus,
the costs of this action, plus recovery of its attorneys' fees expended in this action, as
Defendant Better Beverages actions were willful and intentional.

## COUNT XIX –Tortious Interference with Prospective Economic Advantage Against All Defendants

340.    MV and MJM repeat and incorporates by reference the allegations set
forth in Paragraphs 1 through 339 above.

341.     MV has had a business relationship with Sprouts, WFM and Stop & Shop
and its predecessors, as well as other customers, pursuant to contracts secured by
MJM.

342.    Before Defendants' actions, MV and MJM also had other potential and
existing business relationships with other third parties.

343.    Defendants knew of those business relationships.

344.    Defendants intentionally and improperly interfered with MV's business
relationships by working with third parties to influence shelf slots on Retail Vendor
shelves, and by misappropriating MV's trade secrets, and using said stolen information
to gain unfair competitive advantage with Retail Vendors and Distributors, such as Stop
& Shop and Sprouts.

345.    Defendants' actions induced or otherwise caused Stop & Shop and other
third parties not to enter into or continue the prospective relations with MV and/or

prevented MV and MJM from acquiring or continuing prospective relations with those third parties.

346.    Defendants' interference caused injury to MV and MJM, including, specifically, by way of illustration and without limitation of the foregoing, and others to be uncovered, but not limited to, the loss of the following prospective business opportunities:

        a.  Shelf slots at Sprouts,

        b.  Shelf slots at WFM,

        c.  Shelf slots at Stop & Shop,

        d.  Resealable Kombucha in gym-safe 16oz aluminum bottles to be sold at Life time Fitness; and

        e.  Commission stemming therefrom owed to MJM.

347.    As a result of the Defendants' Tortious Interference, MV and MJM have been damaged, and will continue to be damaged, in an amount to be proven at trial.

348.    Unless the Defendants are enjoined by this Court from continuing these aforementioned actions, MV and MJM suffer, and will continue to suffer, immediate, substantial, and irreparable injury, for which there is no adequate injury at law.

## COUNT XX –Unjust Enrichment Against All Defendants

349.    MV and MJM repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 348 above.

350.    Defendants through their use, receipt, or misappropriation of MV's proprietary information, including but not limited to: MV's trade secrets, MJM and MV's

goodwill and brand identification; and have conferred benefits on themselves at MV's and MJM's expenses.

351.    Defendants received and appreciated the benefits.

352.    As a result of Defendants' actions, Defendants have been unjustly enriched at the expense of MV and MJM inasmuch as Defendants have obtained money and other benefits from or through Defendant Better Beverages use of MV's trade secrets and MV's Capper, and Defendant Better Beverages and Defendant ICK's improper theft of MV's Retail Vendor slots.

353.    Moreover, Defendants have usurped valuable business opportunities that otherwise would have been obtained by MV.

354.    Defendants maintain knowledge of the information conferred upon them by benefit of their illegal activities.

355.    Under the circumstances, it is unjust for Defendants to retain the benefits from their actions without paying the value thereof. The benefits provided include contracts awarded and monetary compensation paid directly to Defendant Better Beverages, Defendant ICK and to others on Defendant Better Beverages behalf.

356.    As a result of the foregoing, MV has been damaged, and will continue to be damaged, in an amount to be proven at trial.

**COUNT XXI –Common Law Conspiracy Against all Defendants**

357.    MV and MJM repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 356 above.

358.     Defendants conspired to defraud MV and usurp MV's trade secrets, confidential information, sales plans, business opportunities; financially damage MV and

MJM through non-payment of monies owed, all to further the interests of Defendant Better Beverages at the expense of MV and MJM. And, in furtherance of this goal, Defendants entered into an unlawful plan and agreement.

359.    Defendants conspired to defraud MV and MJM by written instruments materially misrepresenting the acquisition of Defendant HCK, in connection with Defendants attempts to frustrate successor liability and efforts by plaintiffs to exercise their rights.

360.    Defendants conspired to produce and distribute Mortal Kombucha under a new company despite having no licensing agreement in place with MV.

361.    Manifestations of the unlawful plans and each Defendant's agreement are detailed above.

362.    The agreement and conspiracy were furthered by one or more intentional, unlawful, and overt acts, including but not limited to, trade secret misappropriation, conversion, violations of the Lanham Act, the Copyright Act, tortious interference with economic advantage, breach of fiduciary duty, and fraud.

363.    As a result of Defendants' conspiracy and unlawful acts in furtherance of the conspiracy, MV and MJM have been damaged, and will continue to be damaged, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, MV prays for the following relief:

1) Judgment against Defendants awarding MV and MJM compensatory, consequential, and statutory damages, including, without limitation, loss of income, treble damages, actual damages, pre- and post-judgment interest, non-economic damages, and Defendants' profits, as allowed by law;

2) An award of attorneys' fees and costs as allowed by law;

3) An order pursuant to Col. Rev. Stat § 18-17-106(1)(a), requiring the individual Defendants to divest themselves of any interest in Defendant Better Beverages, including real and/or personal property;

4) An order, pursuant to Colo. Rev. Stat. § 18-17-106(1)(c) and (e), dissolving Defendant Better Beverages and requiring the forfeiture of the charter of its incorporation, or whichever entity materially controls cash accounts for Defendant Better Beverages operations;

5) An order enjoining Defendants from taking further acts that will injure MV, including but not limited to:

   a) implementing any obtained contracts or subcontracts using any trade secrets, technology, or other property misappropriated from MV including: MV's Capper and recipes;

   b) bidding on, obtaining, or implementing any new contracts of any kind using any trade secrets, technology, or other property misappropriated from MV including: MV's Capper and recipes;

   c) further using or revealing any information misappropriated from MV;

6) An order requiring the Defendants to return of MV's physical property, trade secrets, and money, and other intellectual property

7) An order pursuant to 17 U.S.C. § 503 causing impoundment and disposition of infringing articles, including but not limited to the entirety of Defendant ICK's kombucha line.

8) All other relief as may appear just and proper by this Court.


### <u>PLAINTIFFS DEMAND A BENCH TRIAL ON ALL ISSUES SO TRIABLE</u>


Dated: July 2, 2025

s/ Galen Peterson
Galen Peterson #57960
J.A. LLC
10901 W. 120th Ave. Suite 120
Broomfield, CO 80021
T: (303) 459-7898
Galen.Peterson@frontrangelegalservices.com
*Attorney for Plaintiff Mortal Ventures LLC and MJM Sales Management LLC*

s/ John A. Arsenault
John A. Arsenault, #41327
J.A. LLC
10901 W. 120th Ave. Suite 120
Broomfield, CO 80021
T: (303) 459-7898
John.Arsenualt@frontrangelegalservices.com
*Attorney for Plaintiff Mortal Ventures LLC and MJM Sales Management LLC*